**BANCO NACIONAL de CUBA,**
Plaintiff-Appellant,

v.

**F. Shelton FARR, William F. Prescott, Emmet Whitlock, Lawrence H. Dixon, H. Bartow Farr, Elizabeth C. Prescott, Fabio Freyre and Helen G. Downs, copartners doing business as Farr, Whitlock & Co., Defendants and 3rd-Party Plaintiffs-Appellees,**

v.

**COMPANIA AZUCARERA VERTIENTES-CAMAGUEY de CUBA and Lehman Brothers, 3rd-Party Defendants-Appellees.**

No. 59, Docket 30341.

United States Court of Appeals
Second Circuit.

Argued Nov. 14, 1966.

Decided July 31, 1967.

Victor Rabinowitz, Leonard B. Boudin, Rabinowitz & Boudin, New York City (P. Kent Spriggs, New York City, on the brief), for plaintiff-appellant.

C. Dickerman Williams, Harold d'O. Baker, Baker, Nelson, Williams & Mitchell, New York City, for defendants and third-party plaintiffs-appellees.

Whitney North Seymour, Sr., Eastman Birkett, John A. Guzzetta, Gerald M. Levin, Simpson, Thacher & Bartlett, New York City, for third-party defendants-appellees.

Arthur H. Dean, New York City, Erwin N. Griswold, Cambridge, Mass., Max Chopnick, G. W. Haight, Doris Carroll, Benjamin Busch, New York City, for amicus curiae, The American Bar Association.

Peter J. Kooiman, George W. Haight, New York City, John G. Laylin, Monroe Leigh, Washington, D. C., Myres S. McDougal, New Haven, Conn., Cecil J. Olmstead, New York City, William A. Dobrovir, Washington, D. C., for Amicus Curiae, the Executive Committee of the American Branch of the International Law Association.

Before WATERMAN, MOORE and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York dismissing the appellant's complaint and the defendant's complaint against impleaded third parties. This litigation has been the subject of three much-discussed previous opinions. In the original hearing of the action before the district court summary judgment was granted in favor of the defendants, D.C., 193 F.Supp. 375 (1961). This disposition was affirmed by this court (307 F.2d 845 (1962)), but reversed by the Supreme Court, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). The facts have been fully stated in these opinions, see e.g., the opinion of Mr. Justice Harlan for the Court, 376 U.S. 398 at 401–408, 84 S.Ct. 923. On remand the district court has again ruled in favor of the defendants in an opinion reported

at 243 F.Supp. 957 (July 30, 1965), later supplemented by opinion of November 16, 1965, 272 F.Supp. 836, at the time judgment was entered.

This action, which has served as the test case [1] for litigation concerning Cuban expropriations, involves the disposition of the proceeds of the sale of a cargo of sugar which was expropriated by the Castro government while the cargo was in Cuban territorial waters.

During February and July of 1960 appellee Farr, Whitlock & Co. (a copartnership hereinafter referred to as Farr, Whitlock) an American commodity broker, contracted with a wholly-owned Cuban subsidiary of appellee Compania Azucarera Vertientes-Camaguey de Cuba (C. A. V.) for the purchase of Cuban sugar. The sugar was to be delivered free alongside the steamer in Cuba, and payment was to be made in New York by Farr, Whitlock upon presentation of shipping documents and a sight draft.

Pursuant to the contracts, 22,000 bags of sugar were loaded on board the German vessel S.S. Hornfels which was standing offshore at the Cuban port of Jucaro. The loading took place between August 6 and August 9, 1960. On August 6, 1960 the Cuban government passed a resolution [2] providing for the compulsory expropriation of all property located within Cuban territory of appellee C. A. V., a corporation organized under Cuban law but owned to the extent of more than ninety per cent of its capital stock by residents of the

1. It is stated in the district court's opinion that thirty-five cases "involving a wide spectrum of questions arising out of Cuban expropriations" remain before the court below awaiting the final determination of this case. 243 F.Supp. 957, 962 (1965).

2. The resolution, which was promulgated by the Cuban President and Prime Minister provides:

WHEREAS, the attitude assumed by the Government and the Legislative Power of the United States of North America, of continued aggression, for political purposes, against the basic interests of the Cuban economy, as evidenced by the amendment to the Sugar Act adopted by the Congress of said country, whereby exceptional powers were conferred upon the President of said nation to reduce the participation of Cuban sugars in the sugar market of said country, as a weapon of political action against Cuba, was considered as the fundamental justification of said law.

WHEREAS, the Chief Executive of the Government of the United States of North America, making use of said exceptional powers, and assuming an obvious attitude of economic and political aggression against our country, has reduced the participation of Cuban sugars in the North American market with the unquestionable design to attack Cuba and its revolutionary process.

WHEREAS, this action constitutes a reiteration of the continued conduct of the government of the United States of North America, intended to prevent the exercise of its sovereignty and its integral development by our people thereby serving the base interests of the North American trusts, which have hindered the growth of our economy and the consolidation of our political freedom.

\*　\*　\*　\*　\*

WHEREAS, it is the duty of the peoples of Latin America to strive for the recovery of their native wealth by wrestling it from the hands of the foreign monopolies and interests which prevent their development, promote political interference, and impair the sovereignty of the underdeveloped countries of America.

\*　\*　\*　\*　\*

NOW, THEREFORE: In pursuance of the powers vested in us, in accordance with the provisions of Law No. 851, of July 6, 1960, we hereby

RESOLVE:

FIRST. To order the nationalization, through compulsory expropriation, and, therefore, the adjudication in fee simple to the Cuban State, of all the property and enterprises located in the national territory, and the rights and interests resulting from the exploitation of such property and enterprises, owned by the juridical persons who are nationals of the United States of North America, or operators of enterprises in which nationals of said country have a predominating interest, as listed below, to wit:

\*　\*　\*　\*　\*

22. Compania Azucarera Vertientes Camaguey de Cuba.

\*　\*　\*　\*　\*

United States. As a result of the resolution the consent of the Cuban government was necessary before the S.S. Hornfels was allowed to sail from Cuban waters. This consent was obtained on August 11 when Farr, Whitlock entered into contracts identical to its prior contracts with the subsidiary of C. A. V. with Banco Para el Commercio Exterior de Cuba (Banco Exterior), an instrumentality of the Cuban government. On August 12 the S.S. Hornfels sailed to Morocco with its cargo of sugar.

Banco Exterior assigned the bills of lading to appellant Banco Nacional de Cuba (Banco Nacional), the financial agent of the Cuban government. Banco Nacional sent them to Societe Generale, a French bank which acted as its New York agent, for presentation to Farr, Whitlock in New York. Farr, Whitlock gained possession of the bills of lading on August 29, 1960 without making payment upon presentation. The funds were claimed from Farr, Whitlock on behalf of C. A. V.,[3] and Farr, Whitlock for this reason refused to make payment to Societe Generale or to return the bills of lading.

The present action was commenced by Banco Nacional in the United States District Court for the Southern District of New York on October 10, 1960, alleging that Farr, Whitlock had converted the bills of lading by its refusal to return them or to pay over their proceeds to Societe Generale. On October 24, 1960, pursuant to an order of the New York Supreme Court, Kings County, Farr, Whitlock transferred the proceeds of the bills of lading, a total of $173,936.31, to a New York court appointed Temporary Receiver, Sabbatino. The complaint in the present action was amended on October 31, 1960 to include Sabbatino as a defendant.

On March 31, 1961 the district court, acting on various motions of the parties before it, held that it had jurisdiction over the subject matter of the action despite state court control of the funds at issue. It granted summary judgment for the defendants, holding that the taking of the sugar by the Cuban government violated international law in three respects: it was motivated by a retaliatory purpose, not a legitimate public purpose; it discriminated against nationals of the United States; and it failed to provide adequate compensation for the property taken; and inasmuch as the taking violated international law, Cuba did not acquire good title to the sugar upon which to base its claim of conversion.

We affirmed this judgment on July 6, 1962, holding that the failure of the Cuban government to pay adequate compensation to C. A. V. for the taking of its property, combined with the evident retaliatory purpose and the discriminatory effect of the taking upon the rights of American nationals, constituted a violation of international law. We rejected, just as the district court had previously rejected, the appellant's contention that the act of state doctrine applied to this case; and we based in part our conclusion on two letters written by State Department officers evidencing the fact that the Executive Branch had no objection to a judicial determination of the merits of the controversy.

The Supreme Court granted certiorari, 372 U.S. 905, 83 S.Ct. 717, 9 L.Ed.2d 715 (1963), and reversed us on March 23,

---

3. Farr, Whitlock received notice on August 23, 1960 that Peter L. F. Sabbatino on August 16 had been appointed Temporary Receiver for the assets of C. A. V. within New York State pursuant to N.Y.Civ. Prac.Act, § 977–b.

On August 26th Farr, Whitlock was notified by officers of C. A. V. that C. A. V., not the Cuban government, was the rightful owner of the sugar covered by the bills of lading which Societe Generale held. Farr, Whitlock and C. A. V. entered into an agreement on that day that Farr, Whitlock would retain the proceeds of the sugar shipments unless compelled to turn them over by court order. In return for this, C. A. V. would indemnify Farr, Whitlock against any claims and defend any suits against Farr, Whitlock for the sugar or the proceeds therefrom. In addition, C. A. V. promised to pay Farr, Whitlock ten per cent of the proceeds if C. A. V. were ultimately successful in obtaining them.

1964, 376 U.S. 398, 84 S.Ct. 923, 11 L. Ed.2d 804. The Court held that the act of state doctrine did apply to this case, and therefore the courts of the United States were prevented from examining the validity of the acts of the Cuban government under international law "in the absence of a treaty or other unambiguous agreement regarding controlling legal principles * * *." 376 U.S. at 428, 84 S.Ct. at 941. The Court declared that the act of state doctrine had " 'constitutional' underpinnings" arising out of the "basic relationships between branches of government in a system of separation of powers." 376 U.S. at 423, 84 S.Ct. at 938.[4] The Court did not reach the issue of whether the taking in this case violated international law. See 376 U.S. at 433, 84 S.Ct. 923. It remanded the case to the district court to hear and decide any litigable issues of fact which might develop and for "proceedings consistent with this opinion." 376 U.S. at 439, 84 S.Ct. at 946.

On March 28, 1963, one year before the decision of the Supreme Court was handed down, Banco Nacional, Farr, Whitlock, C. A. V., and Sabbatino agreed that Lehman Brothers would hold a sum of money in escrow to satisfy the final judgment in this case, and Sabbatino transferred $225,000 to Lehman Brothers for this purpose. The agreement also provided that C. A. V. would indemnify Farr, Whitlock for any excess of any judgment against it over the amount in the escrow fund. Thereafter the New York state Temporary Receivership was terminated by order of the New York Supreme Court and Sabbatino was eliminated as a party to this case by a stipulation of the parties.

After this case was remanded to the district court appellant moved for final judgment in its favor but judgment was not entered due to a miscellany of complications, see 243 F.Supp. 957, at 961–962, and while the proceedings relative to the entry of judgment on remand were pending the Hickenlooper Amendment[5] was enacted into law on October 7, 1964. It provided:

Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right is asserted by any party including a foreign state (or a party claiming through such state) based up-

4. Our view that the two letters written by State Department officers indicated that the Executive Branch had no objection to a judicial determination as to the validity of Cuba's actions under international law proved erroneous when the Executive Branch formally filed an *amicus* brief in the Supreme Court on the side of Banco Nacional and participated in the oral argument before the Court.

5. The Hickenlooper Amendment, which has also been referred to elsewhere as the Sabbatino Amendment or the Rule of Law Amendment, was attached to the Foreign Assistance Act of 1964 and became Section 301(d) (4) of that act. (Pub.L. 88–633, 78 Stat. 1009, 1013.)

The Amendment was reenacted in 1965 when the next Congress adopted the Foreign Assistance Act of 1965 (Pub.L. 89–171, 79 Stat. 653) which became law on September 6, 1965. The re-enactment contained a slightly different version of the Hickenlooper Amendment, and is found in Section 301(d) (2) of that Pub-

lic Law. Incorporated into the U. S. Code it is found at 22 U.S.C. § 2370(e) (2). The only change was the substitution of "other right to property" for "other right" in two instances, and the deletion of Proviso 3, which had formerly made the Amendment inapplicable to any case in which the proceedings had not been commenced before January 1, 1966.

These changes in no way affect the case before us, and when we have discussed the Amendment throughout our opinion we have made no attempt to differentiate the Amendment in effect from October 7, 1964 from the Amendment in effect from September 6, 1965 to date. The Amendment, as first adopted, appears here in the text, the re-enacted version is incorporated into footnote 20. It is interesting to note that these language changes became law during the 60 day period when the court below was awaiting word from the Executive before ordering the entry of judgment. See footnote 1 in Judge Bryan's supplemental opinion. D.C. 272 F.Supp. 837.

on (or traced through) a confiscation or óther taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: *Provided,* That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court, or (3) in any case in which the proceedings are commenced after January 1, 1966.

On November 12, 1964 an order was entered impleading C. A. V.[6] and Lehman Brothers as third party defendants pursuant to Fed.R. Civ.P. 14.

Defendant Farr, Whitlock and the third-party defendants moved for summary judgment dismissing the complaint, based on the Hickenlooper Amendment. On July 30, 1965 the district court granted these motions, witholding final judgment for sixty days to allow the President to exercise his rights under the second proviso of the Amendment. Final judgment was entered on November 17, 1965 after the Court was notified that the Executive Branch did not intend to intervene and to suggest application of the act of state doctrine in this case.[7]

The district court in a scholarly and well-reasoned opinion held that the Hickenlooper Amendment applied to the case at bar, that the Amendment was constitutional, and that it was bound by our prior determination, 307 F.2d 845 (1962), that the expropriation by the Cuban government violated international law. The same issues are raised before us, and in disposing of them we reach the same result the lower court reached, adopting as our own much of the discussion and points made by the learned judge below.

I. *The Applicability of the Hickenlooper Amendment*

Appellant first claims that the Hickenlooper Amendment was not intended to apply to "transactions" completed before the date of its enactment. If this is so and the expropriation here is a "transaction" the present case would be excluded from the effect of the amendment, for the expropriation in this case occurred on August 6, 1960, and the Amendment was not enacted until October 7, 1964.

 In interpreting a statutory provision, we first direct our attention to the applicable words in the statute in order to analyze the meaning and effect of those words in relation to the subject matter treated. The words of the Amendment which deal with the ex-

---

6. C. A. V. moved before the Supreme Court to be substituted as a party for Sabbatino but the motion was denied without prejudice to its renewal in the lower courts. 376 U.S. at 407–408, 84 S.Ct. at 929. C. A. V. submitted a brief and made oral argument before the Supreme Court as *amicus curiae.*

7. The court received a letter from the United States Attorney for the Southern District of New York dated September 29, 1965 which reads:

In its decision of July 30, 1965 this Court afforded the Executive Branch the opportunity to file a suggestion indicating whether the application of the act of state doctrine is required by the foreign policy interests of the United States, as provided for in Section 620 (e) (2) of the Foreign Assistance Act of 1961, as amended (22 U.S.C. § 2370 (e) (2).) I am instructed to inform the Court that no determination has been made that application of the act of state doctrine is required in this case by the foreign policy interests of the United States.

So that there will be no ambiguity, the Court is advised that no such determination is contemplated.

propriations it is intended to apply to are:

> \* \* \* a case in which a claim of title or other right to property is asserted by \* \* \* a foreign state (or a party claiming through such state) based upon \* \* \* a confiscation or other taking after January 1, 1959 \* \* \*.

The case before us would seem to fall within the above statutory language. Here a claim of title is being asserted by a party claiming through a foreign state based upon a taking after January 1, 1959.[8] It may be noted that the statute refers specifically to a "case," not to a mere claim or cause of action which had not been the subject of court action prior to the enactment of the statute. This use of "case" indicates that Congress meant to affect the result of pending litigation as well as to affect a more nebulous group of unlitigated claims. Moreover, it is well established that when a statute specifically applies to past transactions, as the Hickenlooper Amendment does, it applies to pending cases too, because a case must be decided according to the law as it exists at the time of final judgment. See, e. g., Hamm v. City of Rock Hill, 379 U.S. 306, 85 S.Ct. 384, 13 L.Ed.2d 300 (1964); United States v. Alabama, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960) (per curiam); Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Carpenter v. Wabash Ry., 309 U.S. 23, 60 S.Ct. 416, 84 L.Ed. 558 (1940); Dinsmore v. Southern Express Co., 183 U.S. 115, 22 S.Ct. 45, 46 L.Ed. 111 (1901); United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 109, 2 L.Ed. 49 (1801) (Marshall, Ch. J.); cf. Vandenbark v. Owens-Illinois Glass Co., 311 U.S. 538, 61 S.Ct. 347, 85 L.Ed. 327 (1941). It is true, as appellant points out, that these cited cases differ from the present case in some particulars; one is a criminal case, others involve whether injunctive relief should be granted or denied, and others involve the effect of a new treaty or a change in the case law; and none involve the effect of a new statute. In total, however, they lay down a rule both reasonable and just and appellant gives no convincing reason why the rule should not be applied in this case where a statute has become law while the case has been pending.

Appellant argues that in the absence of a clear indication that retroactive application is intended there is a presumption that a statute is intended to operate prospectively only. This proposition is well supported by authority, but there is no ambiguity in the Hickenlooper Amendment that would permit the presumption to be operative, for in the language of the Amendment which we have discussed above there is a clear expression of a legislative intention that it is to be applied retroactively. That the statute, enacted in 1964, applies to takings effected after January 1, 1959 is a clear indication that retroactivity was intended.

■ The legislative history of a statute is useful when the meaning of the statute is not apparent from the language. Though, as we have said, we have had no difficulty in ascertaining that the Hickenlooper Amendment applies to a case based on a taking after January 1, 1959, we will nevertheless examine the legislative history of the amendment to consider whether it provides any basis for appellant's contention that it was not intended to apply to cases pending at the time of its enactment.

During the spring and summer of 1964 Congress was considering amendments to the basic Foreign Assistance Act. The House passed a version of the Foreign Assistance Act of 1964 and sent it to the Senate where it was referred to the Com-

---

8. Appellant claims that January 1, 1959, the date on which the Castro government took office in Cuba is "more symbolic than significant."

Even if this is true we cannot see how it makes any difference in the face of the express inclusion of that date in the statute. Nor is the fact that the first expropriations after that date occurred in Brazil, not Cuba, of any relevance.

mittee on Foreign Relations. At this point Senator Hickenlooper proposed the amendment in issue here and it was included in the version of the Act reported to the Senate in essentially the same form as it is now, expect that the 1964 version applied only to cases commenced before January 1, 1966. The Senate Report stated:

> The amendment is intended to reverse in part the recent decision of the Supreme Court in Banco de Nacional de Cuba v. Sabbatino. The act of state doctrine has been applied by U. S. courts to determine that the actions of a foreign sovereign cannot be challenged in private litigation. The Supreme Court extended this doctrine in the *Sabbatino* decision so as to preclude U. S. courts from inquiring into acts of foreign states, even though these acts had been denounced by the State Department as contrary to international law.

> In the *Sabbatino* case, the Banco Nacional de Cuba sued to recover the proceeds of a sale of Cuban sugar by an American-owned company on the ground that the sugar, which had been expropriated, belonged to the Cuban Government. The lower courts dismissed the suit, but the Supreme Court reversed these decisions and remanded the case for further proceedings on the ground that it would not inquire into the act of the Cuban State.

> \* \* \* \* \* \*

> The effect of the amendment is to achieve a reversal of presumptions. Under the *Sabbatino* decision, the courts would presume that any adjudication as to the lawfulness under international law of the act of a foreign state would embarrass the conduct of foreign policy unless the President says it would not. Under the amendment, the Court would presume that it may proceed with an adjudication on the merits unless the President states officially that such an adjudication in the particular case would embarrass the conduct of foreign policy [9]

The bill, including the amendment, was then passed by the Senate and sent to a conference committee. The conference report explains several of the provisions which appear in the final version of the amendment before us:

> The managers on the part of the House regretted that there had not been an opportunity for thorough study and full hearings on the subject. The committee of conference amended the Senate language to pinpoint its precise effect, making it clear that it does not apply if no violation of international law principles is found, or if the case involves a short term irrevocable letter of credit issued in good faith prior to the taking of property by a foreign state. The exception in those individual cases in which the President determines that judicial review of the foreign government's action is not in the U. S. foreign policy interest is preserved. An additional change was added to limit the application of the amendment to cases in which the proceedings are commenced before January 1, 1966. This limitation was approved with the understanding that the congressional committees concerned will make a full review and study of the matter during the next Congress and make a determination on the need for permanent legislation.[10]

As stated before, the amendment was enacted into law on October 7, 1964.

■ Further amendments to the Foreign Assistance Act were considered and enacted by the next session of Congress, among them an amendment (see footnotes 5 and 20) which eliminated the third proviso from the Hickenlooper Amendment and made it permanent legislation, applicable to all future expropriations. The

---

9. S.Rep. No. 1188, Part I, 88th Cong., 2d Sess. 24 (1964).

10. H.R.Rep. No. 1925, 88th Cong., 2d Sess. 16 (1964).

Senate Report on this bill contained the statement:

> *The existing law applies to cases pending at the time of its enactment* or brought since then in which "a claim of title or other right" is asserted based upon a confiscation or other taking after January 1, 1959, by an act of a foreign state in violation of the principles of international law. (Emphasis supplied.) [11]

It should be noted that the above statement was made at a subsequent session of Congress but it was made before the decision of the court below in this case. [12] Such pronouncements by a subsequent Congress are not entitled to the same weight as those of the Congress which enacted a measure, see e. g., United States v. Price, 361 U.S. 304, 80 S.Ct. 326, 4 L.Ed.2d 334 (1960); Federal Housing Administration v. Darlington, Inc., 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); cf. United States v. United Mine Workers of America, 330 U.S. 258, 281–282, 67 S.Ct. 677, 91 L.Ed. 884 (1947), but they are useful when one attempts to determine the intention of the earlier Congress. Federal Housing Administration v. Darlington, Inc., supra.

■ In addition to these committee reports the parties have referred us to remarks of Senator Hickenlooper made during the debates on the Senate floor over the Foreign Assistance Acts of 1964 and 1965. While statements made during floor debates are not entitled to the same respect as carefully prepared committee reports, see United States v. International Union (UAW-CIO), 352 U.S. 567, 585–586, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957), these statements made by the original proponent of the Amendment are of some significance, see United States v. International Union (UAW-CIO), supra; cf. Chicago, M., St. P. & Pac. R.R. v. Acme Fast Freight, Inc., 336 U.S. 465, 69 S.Ct. 692, 93 L.Ed. 817 (1949).

On August 14, 1964 Senator Hickenlooper made several statements on the Senate floor and submitted memoranda supporting the Amendment which were included in the Congressional Record.

At one point he said: "Basically the amendment is designed to assure that the private litigant is granted his day in court." 110 Cong.Rec. 18936 (1964). If this statement by the Amendment's sponsor states the amendment's purpose there would seem to be no justification for a restrictive interpretation of the statutory language limiting its application to future litigants; the statement refers to and includes any and all private litigants, it neither specifically includes or excludes litigants whose cases were pending in 1964 when the statement was made.

Later in the debate the Senator expanded on the purpose of the Amendment and what its effect would be:

> This amendment is an exercise of our broad powers with respect to foreign commerce and investment and will restore the rule in our courts that acts of a foreign state are subject to international law. This supplement to section 620(e) of the Aid Act will discourage foreign expropriation by making sure that the United States cannot become a "thieves market" for the product of foreign expropriations.
>
> \* \* \* \* \* \*
>
> One of the principal reasons for the proposed amendment is that it will serve notice that foreign states taking action against U. S. investment in violation of international law cannot market the product of their expropriation in the United States free from the risk of litigation. Thus, the amendment itself will do much to deter illegal takings and thereby exert a positive influence to avoid the embarrassment to U. S. foreign policy interests caused by such takings. 110 Cong.Rec. 19555, 19559 (1964).

---

11. S.Rep. No. 170, 89th Cong., 1st Sess. 19 (1965).

12. S.Rep. No. 170 was filed on April 28, 1965; the opinion below was not filed until July 30, 1965.

Appellant argues that this indication that the Amendment was designed to have a deterrent effect upon future expropriations means that it was not intended to apply to pending cases because application to these cases would not have any deterrent effect on the future actions of foreign governments. It claims that Congress intended that the rights of these litigants would be restricted to those granted in the Cuban Claims Act, 22 U.S.C. §§ 1643–1643k. That Act, however, contained no language indicating that persons claiming under the Hickenlooper Amendment were to be so affected. See 110 Cong.Rec. 22852 (1964) (Statement of Rep. Fascell, sponsor of the bill). Nor is there any reason to believe that, although the Hickenlooper Amendment also had the purpose of preventing the United States from becoming a "thieves market," it was not enacted "basically * * * to assure that the private litigant is granted his day in court," 110 Cong.Record 18936 (1964), and that this assurance was intended to include contemporaneous litigants as well as future litigants.

■ The only persuasive piece of legislative history cited by appellants in support of their position is taken from one of the memoranda submitted to the Senate by Senator Hickenlooper. The memorandum reads in part:

2. Question: "Does the proposed amendment overrule a decision of the Supreme Court?"

Answer: "The amendment will lead U. S. courts to a different result from that reached by the majority in the recent Supreme Court decision in Banco Nacional de Cuba v. Sabbatino. *It does not change the Court's decision in that case.* Rather, the amendment clarifies public policy applicable to such cases pursuant to Congress [sic] constitutional power to legislate concerning the aid program, foreign commerce, and offenses against international law * * *." 110 Cong.Rec. 19557 (1964). (Emphasis supplied.)

This one brief statement tends to support both appellant's position that the Amendment was not intended to apply generally to pending cases, and appellant's position, to be discussed further, infra, that even if the Amendment was intended to apply to other pending cases, it was not intended to apply to this particular case. This was an isolated statement which ordinarily would be accorded but little weight. See Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 396, 71 S.Ct. 745, 95 L.Ed. 1035 (1951); United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 318, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); Nicholas v. Denver & R. G. W. R. R., 195 F.2d 428, 431 (10 Cir. 1952). But, of course, the statement was made by Senator Hickenlooper and would be of some moment except for the fact that a different statement made by Senator Hickenlooper in a letter to the Washington Post was printed in the Congressional Record on the same day. This other statement read:

It should be noted that the amendment is not intended to reinstate the broad holding established in the trial court. *It only modifies the Supreme Court decision in the matter of presumptions.* We think it perfectly proper that the Congress of the United States should have the last word on this important policy question. 110 Cong.Rec. 18936 (1964) (Emphasis supplied.)

The last citation to the congressional debate is given to us by appellee C. A. V. It was made by Senator Hickenlooper during the debate on the Foreign Assistance Act of 1965 and is subject to the same reservations as the committee report on that Act that we have cited supra, it having been said during a subsequent session of Congress. The Senator at that time stated unequivocally: "The Amendment applies to any case pending at the time of its original enactment [Oct. 7, 1964] or brought since then, involving takings since January 1, 1959 * * *." 111 Cong.Rec. 13544 (1965).

In summary, the legislative history provides some support for both parties on the* issue of whether the Hickenlooper Amendment was intended to apply to pending cases, but obviously it is stronger in favor of their inclusion. Certainly this legislative history contains nothing which would make us doubt our conclusion based upon the unambiguous words of the statute that the language of the Amendment demonstrates that the statute was intended to apply to cases pending at the time of its enactment as well as to cases which might subsequently be instituted.

■ As mentioned above, appellant also contends that even if the Hickenlooper Amendment applies generally to all other cases pending at the time of its enactment, it should not apply to this case. It cites the statement of Senator Hickenlooper, quoted supra, that the Amendment was not intended to change the Court's decision in *Sabbatino*. As our earlier discussion of that quotation indicates, that statement, standing alone, cannot be considered to represent the intention of Congress, especially when, as we have noted earlier, the Senator on the very same day published a contradictory statement. In our view, this case before us on appeal falls within the actual language of the Amendment just as precisely as the other pending cases do, and this isolated bit of legislative history, the only one supporting appellant's position, is not enough to indicate a congressional intention to treat this case differently from the other cases.

Appellant also contends that the Amendment may not be applied to this case because to do so would violate the mandate of the Supreme Court. It claims that all litigable issues have already been decided by the nation's highest court, and, these issues having been so decided, the inferior courts are bound thereby despite any intervening event, even the passage of congressional legislation in the area.

■ Since Ex Parte Sibbald v. United States, 37 U.S. (12 Pet.) 488, 9 L.Ed. 1167 (1838) the Supreme Court has consistently held that a lower court with jurisdiction over a case on remand under a Supreme Court mandate is foreclosed from reconsidering matters decided by the Supreme Court. E. g., United States v. Haley, 371 U.S. 18, 83 S.Ct. 11, 9 L.Ed.2d 1 (1962); United States v. Parke, Davis & Co., 365 U.S. 125, 81 S.Ct. 433, 5 L.Ed.2d 457 (1961); Briggs v. Pennsylvania R. R., 334 U.S. 304, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948); In re Washington & G. R. R., 140 U.S. 91, 11 S.Ct. 673, 35 L.Ed. 339 (1891); Tyler v. Magwire, 84 U.S. (17 Wall.) 253, 21 L.Ed. 576 (1872); Ex Parte Dubuque & Pac. R. R., 68 U.S. (1 Wall.) 69, 17 L.Ed. 514 (1863). The rule prevents the lower court from considering newly discovered evidence, In re Potts, 166 U.S. 263, 17 S.Ct. 520, 41 L.Ed. 994 (1897); Mackall v. Richards, 116 U.S. 45, 6 S.Ct. 234, 29 L.Ed. 558 (1885); Southard v. Russell, 57 U.S. (16 How.) 547 (1853) or reconsidering its own jurisdiction, Aspen Mining & Smelting Co. v. Billings, 150 U.S. 31, 14 S.Ct. 4, 37 L.Ed. 986 (1893); Skillern's Ex'rs v. May's Ex'rs, 10 U.S. (6 Cranch) 267, 3 L.Ed. 220 (1810). The rule has even been applied despite the claim that a later Supreme Court decision required a different result. Gaines v. Rugg, 148 U.S. 228, 13 S.Ct. 611, 37 L.Ed. 432 (1893). Of course it does not apply to matters left open by the mandate, e. g., Sprague v. Ticonic Nat'l Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Ex Parte Union Steamboat Co., 178 U.S. 317, 20 S.Ct. 904, 44 L.Ed. 1084 (1900); In re Sanford Fork & Tool Co., 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414 (1895),[13] or when the mandate has been amended to permit the lower court to consider a question. See Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 477,

---

13. In view of our conclusion as to the applicability of the mandate rule, we need not decide whether the terms of the mandate in this case would allow the court below to consider the applicability of the Hickenlooper Amendment. See 243 F. Supp. at 971.

68 S.Ct. 1186, 92 L.Ed. 1502 (1948); 149 Madison Ave. Corp. v. Asselta, 331 U.S. 795, 67 S.Ct. 1726, 91 L.Ed. 1822 (1947); Alaska Juneau Gold Mining Co. v. Robertson, 331 U.S. 793, 67 S.Ct. 1728, 91 L.Ed.2d 1839 (1947).[14]

We have learned of no case involving the effect on the rights of litigants of a federal statute, inconsistent with a Supreme Court mandate, which became law after the Supreme Court had remanded a case to the trial court but before the trial court had acted upon the merits after the remand. None has been called to our attention by the parties and we have found none by independent research. We must therefore determine whether the mandate rule should cover this novel situation; it is our view that it should not be extended to do so.

■■■ The Supreme Court mandate rule is nothing more than one specific application of a general doctrine appellate courts apply to their orders to lower courts, a doctrine commonly referred to as the law of the case, see Briggs v. Pennsylvania R. R., 334 U.S. 304, 306, 68 S.Ct. 1039, 92 L.Ed. 1403 (1948); Ex Parte Sibbald v. United States, 37 U.S. (12 Pet.) 488, 492, 9 L.Ed. 1167 (1838). Other courts in applying the law of the case rule have held that a lower court is not bound to follow the mandate of an appellate court if the mandate is, in the interim, affected by an authority superior to the court issuing the mandate, such as by a higher appellate court, either state or federal, see, e. g., Higgins v. California Prune & Apricot Grower, Inc., 3 F.2d 896 (2 Cir. 1924); Zerulla v. Supreme Lodge O. of M. P., 223 Ill. 518, 79 N.E. 160 (1906); Jones v. Harmon, 122 Ohio St. 420, 172 N.E. 151 (1930); American R. Exp. Co. v. Davis, 158 Ark. 493, 250 S.W. 540 (1923); Orleans Dredging Co. v. Frazie, 179 Miss. 188, 173 So. 431 (1937) or by an *en banc* decision of the same court, Poe v. Illinois Cent. R. R., 339 Mo. 1025, 99 S.W.2d 82 (1936). This principle has also been applied when the mandate of the court is affected by intervening statutory enactment, Petty v. Clark, 113 Utah 205, 192 P.2d 589 (1948); Donaldson v. Chase Securities Corp., 216 Minn. 269, 13 N.W.2d 1 (1943), aff'd, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); cf. Danforth v. Groton Water Co., 178 Mass. 472, 59 N.E. 1033 (1901); Albanese v. McGoldrick, 129 N.Y.S.2d 269 (Sup.Ct. 1954). The same principle should apply here; any limiting language in the Supreme Court mandate should not preclude judicial application of the Amendment in this case for the rule of law expressed by the mandate has been affected by a subsequently enacted federal statute.

■■■ Moreover, as the court below may have indicated, 243 F.Supp. at 971, there may well be a constitutional objection to an application of the mandate here. The law of the case is not based on any constitutional authority but is only a doctrine of judicial administration based on the practice of the courts, Messenger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152 (1912); King v. State of West Virginia, 216 U.S. 92, 100, 30 S.Ct. 225, 54 L.Ed. 396 (1910). A federal statute, on the other hand, is an assertion of its constitutional power by Congress and is entitled to respect as the supreme law of the land. U.S.Const. art. VI, cl. 2. It is questionable whether the courts may frustrate such a statute by interposing a judge-made rule of practice.

Thus we hold that Congress intended that the Hickenlooper Amendment should apply to cases pending at the time of its enactment, including this case.

## II. *Constitutionality of the Hickenlooper Amendment*

Appellant next contends that the Hickenlooper Amendment is unconstitutional both as a general proposition and also as applied to this case and other pending cases. Three basic arguments against the constitutionality of the Amendment are advanced; we shall treat them in turn.

14. We do not find it necessary to consider whether it is too late for the Supreme Court to amend its mandate. See 243 F. Supp. at 971, n. 7.

A. *Due Process.*

Appellant contends that the application of the Hickenlooper Amendment to this case constitutes a deprivation of property in violation of the due process clause of the Fifth Amendment.[15]

Appellant would have us characterize the act of state doctrine as a "substantive" right which is constitutionally protected. It would distinguish the cases cited below in which courts had found no constitutional violation as being cases dealing only with "remedial" or "procedural" matters and not with "substantive property rights." We do not find it useful to make an arbitrary division of the cases under these labels whose meanings are not only uncertain but may vary according to the context in which they are being discussed.

We have examined the cases cited by appellant as supporting its position, such as Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); Forbes Pioneer Boat Line v. Board of Comm'rs, 258 U.S. 338, 42 S.Ct. 325, 66 L.Ed. 647 (1922); Levy v. Wardwell, 258 U.S. 542, 42 S.Ct. 395, 66 L.Ed. 758 (1922); Noble v. Union River Logging R. R., 147 U.S. 165, 13 S.Ct. 271, 37 L.Ed. 123 (1893); Society for the Propagation of the Gospel v. Wheeler, 22 Fed.Cas. 756 (No. 13,156) (C.C.D.N.H.1814). We find that they all involve the destruction of property to which the owner could claim a "vested right," see Campbell v. Holt, 115 U.S. 620, 628, 6 S.Ct. 209, 29 L.Ed. 483 (1885); Swayne & Hoyt, Ltd. v. United States, 300 U.S. 297, 302, 57 S.Ct. 478, 81 L.Ed. 659 (1937), or involve retroactive application of statutes that created new liabilities.

Appellant's situation is readily distinguishable from these cases. The Supreme Court's determination in appellant's favor is based not on any recognition that appellant acquired enforceable rights through the Cuban expropriation, but upon a judicial policy of abstaining from an affirmative determination as to those rights, an abstention held applicable to this case long after the expropriation. The Hickenlooper Amendment thus does not affect appellant's property rights based upon the expropriation nor create any new rights or any new liabilities, see Swayne & Holt, Ltd. v. United States, supra. The application of the act of state doctrine in appellant's favor was without regard to the merits of appellant's claim that its property had been tortiously appropriated by appellee. Its effect in this litigation has been similar to that of a successfully pleaded statute of limitations by which a defendant obtains a judgment without the merits of plaintiff's action ever having been reached. Continuing this analogy, it is well established that modification of statutes of limitation does not create or destroy constitutionally protected property rights in those affected by the changes. Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945); Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885); see Graham & Foster v. Goodcell, 282 U.S. 409, 51 S.Ct. 186, 75 L.Ed. 415 (1931); cf. Swayne & Holt, Ltd. v. United States, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659 (1937).

Appellant's situation is like this latter group of cases and therefore we hold that the application of the Hickenlooper Amendment to this case does not deprive appellant of its property without due process of law under the Fifth Amendment.

---

15. We note with interest the district court's statement that there is "serious doubt" whether appellant, an instrumentality of a foreign government, should be considered a "person" within the meaning of the Fifth Amendment, 243 F. Supp. at 977. But cf. Russian Volunteer Fleet v. United States, 282 U.S. 481, 51 S.Ct. 229, 75 L.Ed. 473 (1931). However, we do not find it necessary to determine this issue because we think it clear that application of the Hickenlooper Amendment to this case does not violate the due process clause.

B. *Legislative Interference with the Judicial Power.*

Appellant also represents that the Hickenlooper Amendment is an unconstitutional exercise by Congress of its legislative power, for the Amendment is a legislative interference with the judicial power and therefore violative of the constitutional doctrine of the separation of powers.

Concededly the Supreme Court grounded its application of the act of state doctrine to this case on the proposition that that doctrine arises from our governmental system of separation of powers, 376 U.S. at 423, 84 S.Ct. at 937, and appellant would read this to mean that under this governmental system the case presented a non-justiciable "political question," see Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), which the Court held that it had no constitutional authority to determine. If this interpretation were correct, the courts would be required to disregard the directive of the Hickenlooper Amendment that cases arising out of foreign expropriations be decided on the merits (unless of course the Executive Branch should intervene).

But we do not think the Supreme Court holding went that far. The Court recognized " 'constitutional' underpinnings" for the doctrine, but also noted that it " * * * does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of state." 376 U.S. at 423, 84 S.Ct. at 938. The doctrine is " * * * compelled by neither international law nor the Constitution, its continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." 376 U.S. at 427–428, 84 S.Ct. at 940. This language would indicate that the Court found no absolute constitutional requirement that the doctrine be applied here, rather, the Court, based upon its estimation of the political effects that would follow from a judicial review of acts of foreign states, exercised its discretion in applying the doctrine.

Appellant notes from the description of the characteristics of a "political question" in Baker v. Carr, supra, 369 U.S. at 217, 82 S.Ct. 691, that an important characteristic of such a question is "lack of judicially discoverable and manageable standards for resolving it." It compares this to the Supreme Court's express statement that, among the nations, there is disagreement as to relevant international law standards that should be applied when the property of aliens is expropriated, because of the divergent interests and different social ideologies of different nations. 376 U.S. at 428–430, 84 S.Ct. at 940–941. But the Supreme Court here does not state that it could not resolve the international law issue if it felt itself called upon to do so. See The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900). Indeed, our Court of Appeals was able to resolve it on the original appeal. The Supreme Court addressed itself not so much to the actual difficulty of reaching a determination upon the merits as it did to a weighing of the political effect of its making the determination it could have made in light of the divided views of different authorities as to the relevant international law standards. This is evident from the Court's statement that: "It is difficult to imagine the courts of this country embarking on adjudication in an area which touches more sensitively the practical and ideological goals of the various members of the community of nations." 376 U.S. at 430, 84 S.Ct. at 941. This language cannot be taken as an indication that the Court felt it was dealing with a non-justiciable political question; the Court specifically stated that its result was not constitutionally required, and indicated the result was reached through the utilization of an abstention policy grounded upon the exercise of judicial discretion.

Thus the application of the act of state doctrine in this case was not constitutionally compelled on the ground that the underlying issue was a political ques-

but he chose not to do so.[19] That the President gave formal approval in this manner, while not conclusive as to its constitutionality, weighs strongly in favor of the validity of the Amendment. The President may be presumed to recognize and to defend his own interest in such a matter. There is evidence before us that the Amendment does not seriously jeopardize that interest; the Department of Justice entered an appearance in the district court as an *amicus curiae* and affirmatively took the position there that the Amendment is constitutional.

For these reasons we reject this last challenge of appellant to the constitutionality of the Hickenlooper Amendment, just as we have rejected all of its other challenges.

III. *Legality of the Cuban Seizure under International Law*

Inasmuch as we have found the Hickenlooper Amendment not to be unconstitutional and to be applicable to this case, we must follow its injunction and " * * * make a determination on the merits giving effect to the principles of international law" as to whether the taking in this case was "in violation of the principles of international law, including the principles of compensation and other standards set out in this subsection * * *."

On this question of whether the taking violated the principles of international law, we said on the previous appeal:

Since the Cuban decree of expropriation not only failed to provide adequate compensation but also involved a

retaliatory purpose and a discrimination against United States nationals, we hold that the decree was in violation of international law. 307 F.2d at 868.

This holding of ours, as noted by the court below, was unaffected when the Supreme Court reversed the result we had reached. The Supreme Court based its resolution of the case upon an application of the act of state doctrine and, as appellant concedes, found it unnecessary to decide whether international law had been violated in this case. See 376 U.S. at 433, 84 S.Ct. at 942, cf. 376 U.S. at 428–430, 84 S.Ct. at 940–941.

■ We do not feel compelled to follow our former holding under the "law of the case" rule, but see Zdanok v. Glidden Co., 327 F.2d 944 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), but we are unable to find any convincing reason, based on argument or new authority, for altering our holding in the original appeal. Accordingly, we will not extensively discuss the international law issue but reaffirm the discussion that is contained in our opinion on the first appeal. See 307 F.2d at 859–868. We will only comment briefly on several aspects of international law involved.

It may be noted that the Hickenlooper Amendment requires us to judge the taking here by principles of international law "including the principles of compensation and other standards set out in this subsection." The subsection referred to, 22 U.S.C. § 2370(e),[20] contains, besides

---

19. We recognize the practical problem which faced the President here. He was presented with an extensive foreign aid bill the great majority of which was undoubtedly acceptable to him, but the bill contained as a "rider" the Hickenlooper Amendment, a provision which he might have wished to veto. However, the lack of an "item veto" is well established as part of our constitutional scheme and, in any case, we cannot presume that because he indicated opposition to it before it was passed by Congress, the President would have vetoed the Amendment even if it had been presented alone.

20. § 2370(e) (1) provides:

§ 2370. Prohibitions against furnishing assistance.

* * * * *

(e) Nationalization, expropriation or seizure of property of United States citizens, or taxation or other exaction having same effect; failure to compensate or to provide relief from taxes, exactions, or conditions; report on full value of property by Foreign Claims Settlement Commission; act of state doctrine.

(1) The President shall suspend assistance to the government of any coun-

the Hickenlooper Amendment, a provision requiring the President to suspend assistance to any country which expropriates or discriminates against property owned by United States citizens or owned by business associations which are more

try to which assistance is provided under this chapter or any other Act when the government of such country or any government agency or subdivision within such country on or after January 1, 1962—

(A) has nationalized or expropriated or seized ownership or control of property owned by any United States citizen or by any corporation, partnership, or association not less than 50 per centum beneficially owned by United States citizens, or

(B) has taken steps to repudiate or nullify existing contracts or agreements with any United States citizen or any corporation, partnership, or association not less than 50 per centum beneficially owned by United States citizens, or

(C) has imposed or enforced discriminatory taxes, or other exactions, or restrictive maintenance or operational conditions, or has taken other actions, which have the effect of nationalizing, expropriating, or otherwise seizing ownership or control of property so owned,

and such country, government agency, or government subdivision fails within a reasonable time (not more than six months after such action, or, in the event of a referral to the Foreign Claims Settlement Commission of the United States within such period as provided herein, not more than twenty days after the report of the Commission is received) to take appropriate steps, which may include arbitration, to discharge its obligations under international law toward such citizen or entity, including speedy compensation for such property in convertible foreign exchange, equivalent to the full value thereof, as required by international law, or fails to take steps designed to provide relief from such taxes, exactions, or conditions, as the case may be; and such suspension shall continue until the President is satisfied that appropriate steps are being taken, and no other provision of this chapter shall be construed to authorize the President to waive the provisions of this subsection.

Upon request of the President (within seventy days after such action referred to in subparagraphs (A), (B), . or (C) of this paragraph), the Foreign Claims Settlement Commission of the United States (established pursuant to Reorganization Plan No. 1 of 1954, 68 Stat. 1279) is hereby authorized to evaluate expropriated property, determining the full value of any property nationalized, expropriated, or seized, or subject to discriminatory or other actions as aforesaid, for purposes of this subsection and to render an advisory report to the President within ninety days after such request. Unless authorized by the President, the Commission shall not publish its advisory report except to the citizen or entity owning such property. There is hereby authorized to be appropriated such amount, to remain available until expended, as may be necessary from time to time to enable the Commission to carry out expeditiously its functions under this subsection.

This subsection is followed by Section 2370(e) (2), the Hickenlooper Amendment in permanent form, substantially as it appears on page 171, supra, but now with the phrase "to property" twice inserted, and with proviso 3 omitted.

(2) Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party including a foreign state (or a party claiming through such state) based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, including the principles of compensation and the other standards set out in this subsection: *Provided,* That this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law or with respect to a claim of title or other right to property acquired pursuant to an irrevocable letter of credit of not more than 180 days duration issued in good faith prior to the time of the confiscation or other taking, or (2) in any case with respect to which the President determines that application of the act of state doctrine is required in that particular case by the foreign policy interests of the United States and a suggestion to this effect is filed on his behalf in that case with the court.

than 50 per cent beneficially owned by United States citizens, unless the expropriating country promptly makes arrangement to compensate for such taking at full value. It is clear that if these domestic statutory standards are different from the international law standards which we applied when we decided this case formerly, the statutory standards tend to be more exacting upon the expropriating nations. As we held that the taking before us violated international law under the possibly less exacting standards which we then applied, the application of the new statutory standards would not affect our decision here. This allows us to leave undecided whether the standard set forth in the Hickenlooper Amendment differs from the standard which we applied on the former appeal, and which we now apply again. It also allows us to avoid the question of whether Congress can thus specify how our United States courts must decide questions of international law, though "The Congress shall have Power * * * To *define* and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations," U.S.Const. Art. I, § 8, cl. 10 (emphasis supplied), see Banco Nacional de Cuba v. First Nat. City Bank, 270 F.Supp. 1004 (SDNY July 25, 1967). But see Falk, The Aftermath of Sabbatino 40–41 (1965); Henkin, Comments on Domke, Act of State Doctrine: Sabbatino in the Courts and in Congress, 3 Colum.J.Transnat'l L. 99, 107, 112–13 (1965).

▮ Appellant has urged strongly that we were in error in our prior determination that it is of no particular significance that C. A. V. is a corporation organized under Cuban law. 307 F.2d at 861, see 376 U.S. at 433, n. 37, at 943. This would be significant if the corporation were owned by resident Cuban citizens, see F. Palico y Compania v. Brush, 256 F.Supp. 481 (SDNY 1966), aff'd per curiam, 375 F.2d 1011 (2 Cir. 1967), but such is not the case here. We repeat with emphasis our earlier language:

> When a foreign state treats a corporation in a particular way because of the nationality of its shareholders, it would be inconsistent for us in passing on the validity of that treatment to look only to the "nationality" of the corporate fiction. 307 F.2d 861.

Here it is clear from the resolution of expropriation, see footnote 2, supra, that the property of C. A. V. was expropriated because it was largely owned by "nationals of the United States of North America," and it is interesting to note that the resolution makes no mention whatever of the nationality of the corporation. The situation is clearly distinguishable from cases cited by appellant, such as the Standard Oil Tankers case, 22 Am.J.Int'l L. 404 (1918), in which a sovereign took action against a corporation because of the nationality of the corporation and not because of the nationality of the shareholders.

Also, to the extent that Congress might impose its standards in the decision of these issues, as discussed supra, we would be required to ignore the nationality of the corporation. The congressional standard requires full compensation for any taking of a corporation or other business association more than 50 per cent beneficially owned by United States citizens irrespective of the nominal nationality of the corporation.

Inasmuch as we thus reaffirm our previous holding that the Cuban taking is invalid under international law, we hold that there is no basis for appellant's assertion of title to the bills of lading involved in this case and its assertion that the proceeds of the sale of the sugar were tortiously converted by defendant. Appellant's claim must fail.

Affirmed.