## INTERSTATE POWER COMPANY, INC., a Delaware corporation, Appellant,

v.

## NOBLES COUNTY BOARD OF COMMISSIONERS, Respondent.

No. C4–98–1607.

Supreme Court of Minnesota.

Oct. 12, 2000.

Phillip A. Kohl, John T. Hareid, Kevin H. Siefken, Christian & Peterson, P.A., Albert Lea, for petitioner.

Jay T. Squires, Ratwik, Roszak & Maloney, P.A., Minneapolis, for respondent.

Samuel L. Hanson, Michael C. Krikava, Briggs and Morgan, Minneapolis, for amicus curiae.

## OPINION

BLATZ, Chief Justice

Appellant Nobles County Board of Commissioners ("Board") denied the application of Respondent Interstate Power Company ("Interstate") for a conditional use permit ("CUP") to upgrade an electrical transmission line. The denial was based in part on an amendment to the applicable county zoning ordinance that was adopted by the Board after the Board initially approved the CUP with a special condition. An appeal of that action was remanded by the court of appeals for findings sufficient to enable judicial review. The court of appeals affirmed the Board's denial of Interstate's application and dismissed for lack of jurisdiction Interstate's challenge to the amendment of the zoning ordinance.

Although we agree with the court of appeals that Interstate's challenge to the general validity of the zoning amendment cannot be reviewed on a writ of certiorari, the application of the amendment to this specific project is within the proper scope of certiorari review of the Board's action on the CUP. In the particular circumstances of this case, the amendment cannot be applied to this project, and the other grounds relied on by the Board in denying the CUP are beyond the permissible scope of the remand. Therefore, we reverse.

Interstate is a Delaware corporation doing business in southern Minnesota, including Nobles County.[1] Interstate has a 34kV (kilovolt) transmission line in Nobles

---

1. Pursuant to Minn. R. Civ.App. P. 110.04, the parties submitted a stipulated statement of proceedings.

County near Wilmont, a three-mile portion of which Interstate proposes to upgrade to 69kV in order to improve reliability. One and one-quarter miles of the three-mile project are in the City of Wilmont and are not involved in this appeal. The remaining 1.75 miles of power lines and poles are located in easements owned by Interstate adjacent to the public right-of-way on County Roads 34 and 69. During the proposed upgrade, some of the poles and lines would be moved to newly-acquired easements, while others would remain in the easements in which they are currently located.

On June 16, 1997, pursuant to the Nobles County zoning ordinance, Interstate applied for a CUP in order to undertake the project. A CUP was necessary because the transmission line is located in an area that Nobles County designated as an "Agricultural Preservation Zone," and a transmission line in excess of 34kV outside the public right-of-way in such a zone is a conditional use.

On July 14, 1997, the Nobles County Planning Commission ("Commission") held its first public hearing on Interstate's CUP application. The county zoning administrator stated that the purpose of the CUP ordinance related to "concerns of higher costs to road projects by having to reroute utilities, which were directly outside the road right-of-way." According to the county highway engineer, the Board wished to keep utilities within the right-of-way so that the utility company would be responsible for the costs of relocation rather than the county, which had "already experienced having to brunt [sic] the cost of relocating a utility" which "can be very costly." [2] He stated his belief that it was unfair to force the taxpayers of Nobles County to bear the cost of relocation. Conversely, a representative of Interstate stated it was unfair to force the customers

of Interstate to pay for relocation when it was the county who may wish to have the lines moved. After discussion, the Commission unanimously recommended approving the CUP outside the right-of-way with the "special condition that Interstate Power Company be responsible for any necessary relocation of their utilities and all costs incurred."

On July 22, 1997, the Board adopted the Commission's recommendation to approve the CUP with the special condition over Interstate's objection. Because of the special condition, Interstate did not accept the CUP, postponed the proposed upgrade project, and appealed the decision.

Interstate sought review of the Board's decision by writ of certiorari in the Minnesota Court of Appeals. Because the Board's approval of the CUP included the special condition that was known to be unacceptable to Interstate, the court of appeals deemed the Board's action to be a de facto denial of the permit. *See Interstate Power Co., Inc., v. Nobles County Bd. of Comm'rs*, No. C5–97–1704 (Minn. App. Apr. 29, 1998) (order opinion) (*Interstate I*). The court explained that the Nobles County zoning ordinance requires the Board to make specific findings in granting a CUP and that *Earthburners, Inc. v. County of Carlton*, 513 N.W.2d 460, 463 (Minn.1994), requires a county board to make written findings explaining its rationale when it denies a CUP, with specific reference to relevant provisions of the zoning ordinance. Because no such findings were provided, the court of appeals held that the record was insufficient to conduct judicial review and therefore remanded for "additional proceedings and appropriate findings." *Interstate I*, slip op. at 3. The court also took note of the comments at the Commission meeting regarding higher costs and stated that the police power in zoning matters is limited to "acts that

---

**2.** If a road project requires alteration of the public right-of-way, utilities whose equipment is within the right-of-way pay the cost of relocation. If utility equipment outside the

right-of-way must be relocated due to a county road project, the county bears the relocation cost.

promote the health, comfort, safety, and general welfare of society and does not embrace revenue measures." *Id.*

After remand, on June 24, 1998, the Commission held a hearing on an amendment to the county zoning ordinance relating to required setback distances for essential services, such as transmission lines. No specific property owners, including Interstate, were given formal written notice of the hearing by the county. No Interstate representative attended. The proposed amendment required essential services that are not in the public right-of-way to be set back from the centerline of the road the same distance as is required for buildings. The setback required in an Agricultural Preservation Zone is 100 feet. *See* Nobles County Ordinance ("NCO") § 603.5(2)a (1996, amended July 7, 1998). The public right-of-way in this case generally extends 50 feet from the centerline of the road, so the transmission lines would need to be placed approximately 50 feet into private land if they were not in the public right-of-way. Minutes from the hearing reflect only one stated reason for considering the proposed amendment:

> [Nobles County Zoning Administrator Larry] Gasow explained that [the amendment] was because the Interstate Power Company appealed the decision of the Board of Commissioners due to a condition put on that Conditional Use Permit involving the setbacks and the right-of-way of the road. The appellate [sic] judge has given us another chance to re-do the hearing with the Interstate Power Company. He stated that we need to give reasons for our conditions, and monetary reasons are not enough. Attorney Jay Squires suggested these changes in the setbacks for essential services in our ordinance.

A motion to approve the amendment carried. On July 7, 1998, the Board considered and adopted the amendment.

Later that day, the Commission and the Board convened for a combined special hearing to reconsider Interstate's CUP application. Representatives from Interstate were present during the meeting and upon learning of the amendment, objected to it on various legal grounds.

The county engineer stated that the highway department planned to improve Highway 34 and a portion of County Road 69 in order to reslope some of the area to help eliminate drifting snow in the winter. He testified that having the electric poles 2 feet from the right-of-way in Interstate's easements would "definitely cause some difficulty for the highway department." He also explained the county's program to systematically acquire slope easements as county roads are improved in order to combat the negative impact of drifting snow on public safety and emergency vehicle travel. He further stated that if poles were placed in areas needed for slope easements, the county could be hindered in its efforts to acquire easements, thereby directly affecting the health, safety, and welfare of the community. In addition, he stated that the pole placement might negatively impact the county's ability to widen a road.

A local farmer addressed the Commission and stated that he was opposed to having poles outside the right-of-way because of the interference with farming and because he believed that the poles devalued the property.

The commissioners and Interstate then discussed the possibility of locating the poles in the public right-of-way. Interstate acknowledged that use of the right-of-way was possible but stated that it preferred to be outside the right-of-way because it "keeps people away from their lines."

A suggestion to postpone placing the poles until after the proposed roadwork was completed was also rejected. The county engineer stated that although the present slope adjustment might be satisfactory for a long time, the idea of what the ideal slope is might change, so there is no guarantee that future slope adjustment

would not be needed. Later in the hearing it was stated that the work on Highway 34 had already been completed.

The county zoning administrator explained the three options available to Interstate: (1) put the poles in the right-of-way; (2) set the poles back 100 feet from the centerline of the road; or (3) apply for a variance. He told the Commission that it should consider Interstate's refusal to accept the special condition to pay for relocation of the poles and explained that based on the opinion of the court of appeals, a special condition amounts to an unlawful denial if the applicant is unwilling to accept it. He also said that the Commission could consider the amendment because it had been passed by the Board and was recorded and pointed out that the amendment applies not just to Interstate's electrical lines but to other essential services as well.

The attorney for Nobles County reminded the Commission that this was a remand from the court of appeals and that the Commission must address concerns of public health, safety and welfare. Further, he said that this was a larger problem than just Interstate and that the new amendment applies to all utilities, not just Interstate. He stated that on County Road 34, the county needed to acquire slope easements to address traffic and sight line issues and that such work requires the county to work in support areas adjacent to the right-of-way. Finally, he told the Commission that if it granted the CUP with no conditions, Interstate could place its poles 2 feet outside the right-of-way in its existing easements.

The Commission stated that it could not use an economic reason to deny the CUP. However, it credited the testimony about snow drifting and the impact poles located 2 feet from the right-of-way has on public health, safety and welfare. One commissioner disagreed with this conclusion, pointing out that the Commission was only dealing with 3 miles out of the 34 miles in

the county.[3] The attorney for the county explained that according to the engineer, the roadwork on Highway 34 had already been completed. The county engineer stated that the easements the county needed were temporary; thus, if resloping were necessary again in the future, "the placement of poles in close proximity to the right-of-way could affect resloping."

Ultimately, the Commission voted to deny Interstate's request by a 4 to 3 vote. The Commission adopted detailed findings of fact.

Immediately after the Commission meeting, the Board met to consider the application for the CUP. All members of the Board had been present at the Commission meeting and had heard the testimony presented there, the Commission's deliberations, and the recommendations for the findings of fact and ultimate denial. The issue of the county obtaining slope easements was again discussed. Interstate stated that the county would have to deal with the poles when it tried to level the area surrounding the roads whether its poles were in the county right-of-way or 2 feet outside of the right-of-way. Further, Interstate explained that its easements were non-exclusive and, therefore, acted as no barrier to the county obtaining slope easements. The Board voted 4–1 to deny Interstate's CUP application and adopted the Commission's findings "in support of the Board's denial of the June 16, 1997 application of Interstate Power."

After its findings of fact and summary of the evidence, the Board stated its findings related to the zoning ordinance criteria:

17. Pursuant to Section 505.1 of the Ordinance, the Board finds:

a. The proposed use will create an excessive burden and will have a negative impact on existing County roads which serve this area of the County.

b. There would be a difference in the effect of a utility line on the value of

3. In fact, only 1.75 miles of the project were within the county's jurisdiction.

adjacent agricultural property whether the line is located inside, 2 feet outside, or 50 feet outside of the County road right-of-way.

c. The utility lines would have an adverse effect on adjacent residential properties in the AG zone.

d. The placement of utility lines outside the right-of-way in contravention of the recently enacted essential service setback requirement is inconsistent with the overall needs of the County.

e. The placement of lines outside the right-of-way in contravention of the recently enacted essential service setback requirement is inconsistent with the Zoning Ordinance, Policy Plan, and purposes of the AG District.

f. The proposed use may cause traffic hazards and may impair the public safety by negatively impacting the ability of the County to properly respond to traffic issues that may arise in the future through the undertaking of a road project.[4]

Interstate sought review of the Board's denial by writ of certiorari to the court of appeals. On March 30, 1999, the court affirmed the Board's decision to deny the CUP. *See Interstate Power Co., Inc., v. Nobles County Bd. of Comm'rs,* No. C4–98–1607, 1999 WL 171495 (Minn.App. Mar 30, 1999) (*Interstate II*). The court dismissed for lack of jurisdiction Interstate's challenge to the zoning amendment as an unlawful basis for the denial. *See id.* at *5. The court held although the amendment is an intervening change in law, the Board could properly apply it to Interstate's application because Interstate does not have a vested right in a CUP and it does not subject Interstate to any new and unanticipated obligations. *See id.* at *3. The court then determined that three of the Board's findings were supported by facts in the record, satisfied the rational basis test, and were sufficient to deny the CUP. *See id.* at *4.

The court noted that while some of the other findings were not supported by facts in the record, the Board's action was valid as long as " 'at least one of the reasons given for the denial satisfies the rational basis test.' " *Id.* (quoting *Trisko v. City of Waite Park,* 566 N.W.2d 349, 352 (Minn. App.), *rev. denied* (Minn. Sept. 25, 1997)). Although Interstate argued that the Board's real reason for denying the permit was an improper revenue measure, the court ruled instead that the decision was, at most, an "exercise of fiscal prudence" and that the Board acted for public health, safety and welfare reasons. *Id.* Finally, the court dismissed for lack of jurisdiction Interstate's attack on the validity of the zoning ordinance amendment. Because amending a zoning ordinance is a legislative action, the court of appeals held that certiorari is not the appropriate method for review. *See id.* at *5.

Interstate seeks review of the Board's legislative amendment of the zoning ordinance and its quasi-judicial denial of the CUP. Interstate argues that it proceeded by writ of certiorari to seek review of both claims to avoid having to start a separate proceeding in the district court to challenge the amendment when it was Nobles County that intertwined the legislative and quasi-judicial issues. Thus, Interstate argues that unless it is permitted to proceed this way, it will be denied a reasonable method of review. Interstate urges us to depart from our traditional limited review by certiorari because Nobles County's legislative decision to amend its zoning ordinance is intertwined with its quasi-judicial decision to deny Interstate's conditional use permit.

## I.

The first issue to be addressed is the proper scope of our review, if any, of the Board's amendment of the zoning ordinance to require setback of essential services that are not in the public right-of-

---

4. The Board found that NCO § 505.1(7) did not apply to Interstate's application.

way (setback amendment). Amendment of a zoning ordinance is a legislative act. *See State by Rochester Ass'n of Neighborhoods v. City of Rochester*, 268 N.W.2d 885, 888 (Minn.1978). Legislative acts affect the rights of the public generally, unlike quasi-judicial acts which affect the rights of a few individuals analogous to the way they are affected by court proceedings. *See State ex rel., Huntley Sch. Dist. No. 4 (Appeal of Common Sch. Dists. Nos. 27, 20, 5 and 3 Faribault County) v. Schweickhard*, 232 Minn. 342, 345, 45 N.W.2d 657, 659 (1951). Ruling on a conditional use permit application is a quasi-judicial act. *See Honn v. City of Coon Rapids*, 313 N.W.2d 409, 416 (Minn.1981). Legislative acts are not reviewable by certiorari in the court of appeals, but by a direct action in district court. *See id.* In contrast, where, as here, a quasi-judicial zoning decision is made by a county board, it is reviewable by writ of certiorari.[5]

■■ Interstate attacks both the legislative act of amending the zoning ordinance and the quasi-judicial act of denying the CUP. Because legislative acts are beyond the appellate court's jurisdiction on certiorari, Interstate's challenge to the enactment – that is, the general validity – of the setback amendment cannot be reviewed in this appeal. Accordingly, the court of appeals correctly declined to address Interstate's arguments that the setback amendment is illegal because it is a revenue measure beyond the proper scope of the county's police power and constitutes a taking of property without just

compensation. But the court erred when it also declined to address the part the setback amendment played in the quasi-judicial act of denying the CUP.

■ The Board did rely on the setback amendment as part of its rationale for denying the CUP. *See* Board findings 17.d. and 17.e., *supra*. Because denial of the CUP was a quasi-judicial act reviewable on certiorari, it is within our jurisdiction to review all the grounds on which the denial was based, including the setback amendment. In explaining the distinction between legislative and quasi-judicial acts in this context we stated:

> In granting or denying a special-use permit, a city council is not altering the legislative judgment as to the zoning classification. Rather, it has the function, adjudicative in nature, of applying specific use standards set by the zoning ordinance to a particular individual use and must be held strictly to those standards.

*State by Rochester Ass'n of Neighborhoods v. City of Rochester*, 268 N.W.2d 885, 889 (Minn.1978). Here, by applying the use standards of the setback amendment to the particular use proposed by Interstate, the Board acted in an adjudicative capacity. That aspect of its decision is therefore subject to review on certiorari. Thus, we can and should determine whether the Board's application of the setback amendment in the quasi-judicial denial of this particular CUP was proper.

---

5. The general rule adopted by this court in *Honn* is that even quasi-judicial zoning actions should be reviewed in district court, not by certiorari review in the court of appeals. *See* 313 N.W.2d at 416. This case falls, however, within a narrow exception to that general rule for decisions by county boards. This exception exists because the legislature has not provided for judicial review of zoning decisions of county boards in the district court as it has for zoning decisions of cities, towns and even county boards of adjustment. *Compare* Minn.Stat. § 462.361, subd. 1 (1998) (providing for district court review of zoning orders of a "governing body" or

board of adjustments); Minn.Stat. § 462.352, subd. 11 (1998) (defining "governing body" as only a city council or town board); and Minn.Stat. § 394.27, subd. 9 (1998) (providing for district court review of board of adjustment decisions) *with* Minn.Stat. § 394.301 (1998) (authorizing county conditional use permit proceedings but without providing for district court review). In this respect, our statement in *In re Livingood*, 594 N.W.2d 889, 893 n. 2 (Minn.1999), that special use permit decisions by city councils as well as county boards are reviewable by writ of certiorari was overly broad.

That is not to say, as Interstate argues, that the Board's partial reliance on the setback amendment opens for review on certiorari all issues related to that amendment. Issues concerning the general validity of the amendment challenge the legislative action of the Board and those issues do not become subject to certiorari review simply because the amendment was considered in the quasi-judicial action. *Cf. Willis v. County of Sherburne*, 555 N.W.2d 277, 282 (Minn. 1996) (concluding that defamation claim was not subject to certiorari review along with wrongful termination claim, despite having arisen from same nucleus of operative facts, where defamation claim did not require inquiry into the quasi-judicial termination decision). We therefore address only the narrow issues of whether the setback amendment can be applied to Interstate's project under the facts giving rise to this case, and if so, whether it provides an adequate basis for the Board's denial of the CUP.

## II.

 A threshold question in reviewing the county's reliance on the setback amendment as a basis to deny the CUP is whether it was permissible for the Board to apply a zoning amendment enacted after an appeal and remand of the Board's initial action on the permit application. For the reasons that follow, we conclude that in the particular circumstances of this case, the Board should not be allowed to apply the setback amendment to Interstate's proposed project because to apply the amendment here is so inequitable that it is arbitrary and capricious. *Cf. Honn*, 313 N.W.2d at 417 (stating standard of review for zoning matters as whether the decision is "unreasonable, arbitrary or capricious").

 The general rule is that appellate courts apply the law as it exists at the time they rule on a case, even if the law has changed since a lower court ruled on the case. *See Holen v. Minneapolis–St. Paul Metro. Airports Comm'n*, 250 Minn. 130, 137, 84 N.W.2d 282, 287 (1957) ("Both reason and the weight of authority uphold the view that when an amendatory statute, which is clearly intended to be retroactive and applicable to pending litigation *involving public rights*, is enacted after judgment and pending appeal, the appellate court must dispose of the case in accordance with the law as changed by such amendatory enactment."). An exception to this rule exists when rights affected by the amended law were vested before the change in the law. *See id.* The United States Supreme Court also adheres to "the principle that a court is to apply the law in effect at the time it renders its decision, *unless doing so would result in manifest injustice* or there is statutory direction or legislative history to the contrary." *Bradley v. School Bd. of Richmond*, 416 U.S. 696, 711, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974) (emphasis added). The principle that changes in the law apply to pending matters except as to vested rights has been applied to zoning matters. *See Property Research and Dev. Co. v. City of Eagan*, 289 N.W.2d 157 (Minn.1980); *Kiges v. City of St. Paul*, 240 Minn. 522, 62 N.W.2d 363 (1953).

 In addition to the existence of vested rights, some courts have relied on equitable estoppel principles to bar application of changed zoning laws to a pending proceeding. This court articulated the elements necessary for estoppel in the zoning context in *Ridgewood Dev. Co. v. State*, 294 N.W.2d 288 (Minn.1980). The court explained:

A local government exercising its zoning powers will be estopped when a property owner, (1) relying in good faith (2) upon some act or omission of the government, (3) has made such a substantial change in position or incurred such extensive obligations and expenses that it would be highly inequitable and unjust to destroy the rights which he ostensibly had acquired.

*Id.* at 292 (quoting Heeter, *Zoning Estoppel: Application of the Principles of Equitable Estoppel and Vested Rights to Zoning Disputes*, 1971 Urb. L. Ann. 63, 66) (emphasis omitted). The court also explained that the government action relied on must have been "wrongful" in order for estoppel to apply. *See id.* at 293.

The instant case presents a slightly different procedural posture in that the zoning ordinance was amended after the Board's initial action on the CUP had been appealed and remanded by the court of appeals. Although we have not had occasion to address the issue, many courts have held that on remand an intervening change in the law will apply rather than the preexisting law or even the "law of the case" as established by the remanding appellate court. *See, e.g., Bradley,* 416 U.S. at 715, 94 S.Ct. 2006; *McClelland v. McClelland,* 393 N.W.2d 224, 226 (Minn. App.1986). As the court of appeals accurately stated in *McClelland,* this is a reflection of the more general principle that a court is to apply the law in effect at the time of its decision. 393 N.W.2d at 226.

▰ Neither the vested rights nor the zoning estoppel exception to the general rule of applying the amended law are applicable here. There is nothing in this record indicating the substantial actions taken in reliance on entitlement to a permit that would be sufficient to create either a vested right or the degree of reliance necessary for estoppel. *See, e.g., Ridgewood,* 294 N.W.2d at 292 (explaining that extensive obligations or expenses in reliance on prior government position are necessary for zoning estoppel); *Hawkinson v. Itasca County,* 304 Minn. 367, 376, 231 N.W.2d 279, 284 (1975) (holding that expenditures associated with the acquisition of the property, the removal of trees, the grading of the land and excavation created no vested right where unzoned property was later zoned residential).

But the absence of vested rights or grounds for traditional zoning estoppel does not mandate that we ignore what has occurred here. We should be cautious about creating procedural circumstances through which zoning authorities feel they have carte blanche to arbitrarily block otherwise lawful development by the passage of new zoning law. This concern is not new:

> While the majority is correct in its statement of the general rule allowing retroactive application of zoning ordinances, * * *, the instant case falls within a major exception to that rule refusing to allow retroactive application in cases of bad faith or *arbitrary* action on the part of a governmental subdivision. Several courts have indicated in this vein that an ordinance enacted as special legislation in an attempt to frustrate a developer's plans to lawfully use his property will not be enforced against such a developer.

*Almquist v. Town of Marshan,* 308 Minn. 52, 82–83, 245 N.W.2d 819, 834–35 (1976) (Kelly, J., dissenting) (emphasis added) (citations omitted). Other courts have recognized that equitable concerns should prevent courts from "approving the proposition that every time a party came close to successfully challenging a town and its zoning board in its zoning actions, his gains could be legislated away by the enactment of an amendment to the ordinance." *State ex rel. Humble Oil & Refining Co. v. Wahner,* 25 Wis.2d 1, 130 N.W.2d 304, 311–12 (Wis.1964). *See also Bankoff v. Board of Adjustment of Wagoner County,* 875 P.2d 1138, 1142 (Okla. 1994) (holding that equitable considerations mandated issuance of permit contrary to intervening amendment of ordinance even though no finding of bad faith or vested rights).

The specific procedural posture and circumstances of this case are such that application of the new setback amendment to this proposed project would result in a "manifest injustice" that warrants deviation from the usual rule of applying the law as amended. Specifically, the limited nature of the remand from the court of

appeals combined with the stated impetus for the amendment compels this conclusion.

When this case was first on appeal, the court of appeals was confronted with a county action that granted the requested CUP subject to the special condition for payment of relocation costs that Interstate found unacceptable. The court decided that the Board's action was in effect a denial of the permit and therefore the Board was required to state its rationale. *See Interstate I*, slip op. at 2 (citing *Earthburners, Inc. v. County of Carlton*, 513 N.W.2d 460 (Minn.1994)). However, the Board had given no explanation for its action. The only evidence available was two statements at the Commission meeting about the increased cost of county road projects resulting from relocation of utilities that were outside the right-of-way. The court of appeals concluded that "[t]he limited consideration of the conditional use permit reflected in the record of the county board meeting and the statements of the planning commission board members relating to economic issues are an insufficient basis on which to conduct judicial review" and remanded to the Board "for additional proceedings and appropriate findings." *Id.* at 3.

This court has previously employed remand to afford an opportunity to provide findings sufficient to enable judicial review in *Earthburners* and in *White Bear Rod and Gun Club v. City of Hugo*, 388 N.W.2d 739, 742 (Minn.1986). In remanding *Earthburners* the court explained that:

> [W]e have been reluctant to allow local boards an opportunity after the fact to substantiate or justify earlier decisions. * * * However, where, as here the board has failed to discharge its responsibilities in connection with this application, we are compelled to offer it the opportunity to do so and to develop a record to allow meaningful appellate re-

view. However, to prevent any unfairness to the applicant, *the board must confine its inquiry to those issues raised in earlier proceedings before the planning commission and the county board * * *.*

513 N.W.2d at 463 (emphasis added) (internal citation omitted). This limitation to previously-considered issues reflects a concern expressed much earlier about "the danger of permitting the [governing body] to deny a special-use permit without contemporaneous findings or reasons and then permit[ting] its members after several months of thought to present reasons perhaps totally unrelated to the actual reasons for denying the permit * * *." *Zylka v. City of Crystal*, 283 Minn. 192, 199, 167 N.W.2d 45, 51 (1969). Recently we explained further that "[t]he remands ordered in *Earthburners* and *White Bear Rod and Gun Club* are merely exceptions to the general principle that when a governmental body denies a permit with such insufficient evidence that the decision is arbitrary and capricious, the court should order issuance of the permit." *In re Livingood*, 594 N.W.2d 889, 895 (Minn.1999).

 These cases establish two crucial points. First, in the rare case when an *Earthburners* remand is necessary because the record of a zoning decision is so inadequate that judicial review is impossible, the county fortuitously avoids application of the general rule that a permit denial not supported by an adequate record or findings will result in an appellate order to grant the permit.[6] Second, when the county receives the benefit of an *Earthburners* remand, to protect the applicant from post hoc creation of new reasons for the denial, the county is limited on remand to the issues raised in the earlier proceedings. *See Earthburners*, 513 N.W.2d at 463.

---

6. We emphasize that *Earthburners* was not intended to provide local government units with a routinized opportunity for a second bite at the apple by neglecting to provide an adequate record for review.

Relying on this latter principle, Interstate has argued that the county was precluded from using the later-enacted setback amendment as a reason to deny the permit on remand since it obviously was not an issue raised in the initial proceedings. The court of appeals reasoned that *Earthburners* is distinguishable because this case, unlike *Earthburners*, involves a change in the law. The court relied on the general rule that even on remand intervening law is to be applied unless it interferes with vested rights, was enacted in bad faith or is successfully challenged in a separate proceeding. But neither the court of appeals nor the Board cites a case in which that rule was applied following a limited *Earthburners*-like remand.[7]

In addition to the limited nature of an *Earthburners* remand, the unusual facts relating to the passage of the setback amendment are such that in fairness the general rule should not apply. Significantly, the only basis articulated for enactment of the setback amendment was to affect the remand of the Interstate CUP application. As stated in the Nobles County Planning Commission minutes:

> [The Nobles County Zoning Administrator] explained that [the amendment] was because Interstate Power Company appealed the decision of the Board of Commissioners due to a condition put on that Conditional Use Permit involving the setbacks in the right-of-way of the road. The appelate [sic] judge has given us another chance to re-do the hearing with the Interstate Power Company. He stated that we need to give reasons for our conditions, and monetary reasons are not enough. [The county's] [a]ttorney * * * suggested these changes in the setbacks for essential services in our ordinance.

This was the only explanation given in support of the setback amendment at either the planning commission or the county board meeting. While these bodies may have had more generalized interests in mind in adopting the amendment, the only articulated reason was to provide grounds for action in the remand of Interstate's appeal.

Had the *Earthburners* exception not been applied in *Interstate I*, the consequence of the lack of adequate findings would have been an appellate order to grant the permit without the special condition. But instead of ordering the Board to issue the permit without the special condition, the court remanded for further findings and explanation. Under *Earthburners*, the Board was limited on remand to issues raised in the initial proceedings. The only issue discussed in the initial proceedings was the higher cost of road projects resulting from relocation of utilities outside the right-of-way. The county then enacted the setback amendment with the sole expressed purpose of affecting the remand.

The effect of the county's action was to subject Interstate to precisely the "unfairness to the applicant" that we sought to avert by limiting *Earthburners* remands to the issues raised in the original proceedings. While a general purpose legislative enactment might have the same effect on the CUP application and reasonably subject the applicant to the general rule that a change in the law is applicable to a proceeding on remand, when the legislative change is expressly intended to affect the remand proceeding, the limitation we articulated in *Earthburners* is improperly circumvented. The unfairness to the applicant is particularly egregious because the *Earthburners* remand is itself an exception to the general practice of requiring the

---

7. Similarly, although the dissent cites numerous cases articulating the usual rule that new legislation is applied to pending litigation, none of those cases involves an *Earthburners*-like remand in which the remand proceedings are limited to the issues previously raised.

We also note that contrary to the dissent's claim, we are not expanding the scope of *Earthburners*. *Earthburners* limits the remand to the same *issues* raised in the earlier proceeding. That is precisely the limitation we apply here.

county to issue the requested permit rather than remanding for further proceedings.

■ The general rule that courts apply the law existing at the time of decision reflects judicial respect for the proper exercise of legislative authority and our concern for separation of powers. That interest is attenuated, however, in these circumstances where the legislative action is aimed at circumventing the limitations imposed by a judicial remand. A proper respect for legislative action does not compel us to turn a blind eye to conduct that threatens to undermine the intent of judicial orders.

The confluence of these factors – the limited *Earthburners* remand and the amendment expressly enacted to affect that remand – leads to the conclusion that application of the new setback amendment to the Interstate project would result in the kind of manifest injustice that warrants departure from the general rule of applying zoning changes to pending proceedings. Accordingly, we hold that the setback amendment may not be applied to the project for which the CUP was sought.[8]

### III.

The court of appeals correctly noted that on remand the Board gave some reasons and made some findings in support of denial of the CUP that did not involve the setback amendment. The court explained that as long as one reason was legally sufficient and supported by facts, the denial should be affirmed. The court concluded that although some of the Board's findings were not supported by evidence, three were supported by the record and were sufficient to deny the CUP. Those findings were: (1) the county is acquiring slope easements adjacent to rights-of-way to reduce their elevation and the amount of drifting snow and that electric poles two feet from the right-of-way will impair resloping, (2) drifting snow has a negative impact on public road travel and emergency vehicles, and (3) the county may have to expand county roads 34 and 69 for safety reasons and [Interstate's] proposed use would burden the planned expansion because it would impair the county's ability to acquire easements. *Interstate II*, 1999 WL 171495, at *4.

■ In its initial action on Interstate's CUP application the Board granted the permit subject to the special condition that "Interstate Power Company be responsible for any necessary relocation of their utilities and all costs incurred." The minutes of that Board meeting do not indicate any discussion on the application and the minutes of the Commission meeting reflect discussion only about the issue of who would bear the costs of relocation for utilities outside the public right-of-way. Approval of the CUP, conditioned only on Interstate's agreement to pay relocation costs, signifies the county's determination that the application satisfied all other relevant criteria. *See Corwine v. Crow Wing County*, 309 Minn. 345, 352, 244 N.W.2d 482, 486 (1976) ("When a use permit is approved, the decision-making body is always implicitly giving the same reason – all requirements for the issuance of the permit have been met."). Accordingly, the only issue raised in the initial proceedings

---

**8.** The dissent's suggestion that the impact of this decision is that plaintiffs can "prevent the legislature and executive agencies from confronting new situations and problems" by initiating lawsuits is overstated and unwarranted. This suggestion overlooks the expressly limited parameters of our decision in two respects. First, as we have repeatedly emphasized in this opinion, it is not just any litigation or any legislation that we address. Rather, it is only litigation in the unusual posture of a remand limited by the principles of *Earthburners*, and it is only legislative action for which the *only* expressed purpose is to affect that limited remand. Second, as we have also expressly explained, we address here only the quasi-judicial action of applying the setback ordinance to this CUP application. The general validity of the setback ordinance is not before us and is not affected by this decision.

either in the discussion by the governing bodies or the permit and special condition was the higher costs for road projects resulting from potential relocation of the utilities.

■ On remand for findings under *Earthburners*, the Board was limited to the reason previously considered – that is, increased cost of road projects resulting from utility relocation costs. But this reason is not addressed in the Board's new findings.[9] Rather, the Board relied on entirely new reasons to support denial of the CUP, reasons that it apparently did not find objectionable when it approved the permit with the special condition attached. The court of appeals held that these reasons relating to slope easements, snow drifting and possible widening of the road for safety reasons were legally sufficient and supported by the record. But even if they were supported by the record, these additional reasons were beyond the scope of the *Earthburners* remand because they were not raised in the initial proceedings. They are, accordingly, legally insufficient and cannot now be used by the Board to support denial of the CUP.

As a result, there remains no permissible basis in the record on which to deny the permit. We therefore remand with instructions to issue the permit without the special condition and with the understanding that the setback amendment cannot be applied lawfully to this particular project.

Reversed and remanded to the Nobles County Board of Commissioners.

GILBERT, Justice (concurring in part, dissenting in part).

I concur with the majority's conclusion that this case should be remanded to No-bles County for issuance of the conditional use permit (CUP). However, I respectfully dissent from the majority's assertion that we can adjudicate the effect of a relevant change in controlling law—the new setback amendment—when no finding about whether it has a rational basis can be made in this writ of certiorari proceeding. Our case law provides that law-making bodies have the authority to change the law relevant and applicable to a particular situation or litigation unless the parties or litigants can demonstrate that they have a vested right or that estoppel should apply. *See, e.g., Holen v. Minneapolis–St. Paul Metro. Airports Comm'n*, 250 Minn. 130, 137, 84 N.W.2d 282, 287 (1957) (stating that appellate courts must dispose of case in accordance with amendatory statutes clearly intended to be retroactive and applicable to pending litigation not involving a vested right). The majority concedes it has no legal authority to review the legislative act of the setback change by certiorari but then goes on to nullify a duly authorized legislative act of the County because it was one of the grounds that was used by the County to deny the CUP. The majority reasons that to allow the effect of this new legislative act would be "so inequitable that it is arbitrary and capricious" and decrees "that the setback amendment cannot be applied lawfully to this particular project."

In its holding, the majority also acknowledges the general rule requiring appellate courts to apply the law as it exists at the time the appellate court ruled, even if there was a change in the law since the lower court considered the matter. The

9. We recognize that the county read the court of appeals' order in *Interstate I* to authorize and perhaps mandate articulation of reasons different from the economic rationale that was the one and only issue raised in the first proceeding. However, we do not read the dicta in *Interstate I* concerning the scope of the police power and revenue measures either to render improper all economic considerations when assessing what will best serve the county's general welfare or to authorize the county to introduce wholly new reasons for its action on remand. The former point is beyond the scope of review in this case, and the latter point would certainly be contrary to our direction in *Earthburners*. In any event, the Board's possible misreading of *Interstate I* is not determinative of its meaning or of the proper scope of review on remand.

majority adds a caveat to this principle. Even though the recognized exceptions to this rule relating to vested rights and equitable estoppel do not apply to these "particular circumstances," the majority reasons that that "does not mandate that we ignore what has occurred here." The court then adds dicta indicating that "we should be cautious about creating procedural circumstances through which zoning authorities feel they have carte blanche to arbitrarily block otherwise lawful development by the passage of new zoning law" citing the dissent in *Almquist v. Town of Marshan*, 308 Minn. 52, 82–83, 245 N.W.2d 819, 834–35 (1976) (Kelly, J., dissenting). Based on this caution, the majority deviates from the usual rule of applying the amended law. Instead, the majority expands *Earthburners, Inc. v. County of Carlton*, 513 N.W.2d 460 (Minn.1994), to limit not only the factual record on remand but also to eliminate lawful changes made by an executive branch acting in its quasi-legislative capacity. It does so even though the Nobles County Board of Adjustments, the zoning authority in Nobles County that handles variances from setback requirements, *see* NCO §§ 502, 506, is not even a party to this proceeding. Nor has Interstate ever applied for a variance. Accordingly, deciding whether Interstate must comply with setback requirements is not properly before the court. We have no constitutional or statutory authority to ignore the quasi-legislative acts of the Nobles County Board of Commissioners on the facts in this proceeding.

Interstate does not have a vested right in the existing law or in pending litigation until there has been a final judgment. *See Holen*, 250 Minn. at 136, 84 N.W.2d at 287. Here, there has been no final judgment and thus, a judicial remand does not tie the hands of a co-equal branch of the government from performing its lawful duties. *See generally Donaldson v. Chase Sec. Corp.*, 216 Minn. 269, 277–78, 13 N.W.2d 1, 5–6 (Minn.1943) (holding that it is proper to apply new legislation to a case where a final judgment has not been rendered). Nor has Interstate acquired a vested right in the existing zoning scheme because there is no vested right in zoning laws, *see Property Research & Dev. Co. v. City of Eagan*, 289 N.W.2d 157, 158 (Minn. 1980), until substantial expenditures have been made, *see Hawkinson v. County of Itasca*, 304 Minn. 367, 374, 231 N.W.2d 279, 283 (1975) (explaining that where unzoned property was later zoned residential, expenditures associated with the acquisition of the property, the removal of trees, the grading of the land or excavation created no vested right because more substantial overt acts are required); *Kiges v. City of St. Paul*, 240 Minn. 522, 538, 62 N.W.2d 363, 373–74 (1953) (holding that mere possession of a building permit, the incurring of some expense and the assumption of obligations preliminary to construction, such as excavation, created no vested right). Short of a vested right, we have held that we will estop the zoning authority from applying its laws where a property owner has taken substantial action in reliance on "wrongful" government conduct. *See Ridgewood Dev. Co. v. State*, 294 N.W.2d 288, 292–93 (Minn.1980) (defining zoning estoppel). Neither legal claim can be made in this case.

The net effect of the majority's holding is that under certain circumstances it may be possible for plaintiffs to initiate lawsuits and, without having to prove zoning estoppel, prevent the legislature and executive agencies from confronting new situations and problems brought to their attention. This is so, even though there is no finding that the zoning authority did not act to promote the general welfare of the public. The Supreme Court of North Dakota has already approved similar legislation based on relocation costs. *See generally Grand Forks–Traill Water Users, Inc. v. Hjelle*, 413 N.W.2d 344, 347 (N.D.1987) (holding that ordinances prohibiting utilities from locating lines within 100' of the center line of a state highway right-of-way without permission from the board of county commissioners and requiring the utilities who

located in contravention of that provision to pay for relocation expenses when necessary for highway expansion were within the police power because they "tend[ ] to promote sound and efficient highway planning, safety, and the public welfare. In limited circumstances, reducing the cost of possible future highway expansion is a permissible objective."). Inquiring into the basis for this legislation is not appropriate during writ of certiorari proceedings by an appellate court. *See Honn v. City of Coon Rapids,* 313 N.W.2d 409, 414 (Minn.1981) (holding that legislative acts are not subject to review by writ of certiorari). Instead, these issues should be first determined in the district court where appropriate findings can be made and where the burden of proof will lie where it properly belongs, on the challenger of the legislation. *See generally State, by Rochester Ass'n of Neighborhoods v. City of Rochester,* 268 N.W.2d 885, 888 (Minn.1978) (stating that the burden for invalidating zoning legislation is on the opponent). Because we cannot inquire into whether this legislation was properly enacted during writ of certiorari proceedings, we must presume, without deciding, that it is a legal enactment.

The majority asserts that the limited nature of the *Earthburners* remand in part compels their holding. However, to reach this result, the court expands *Earthburners* to limit not only the factual record on remand but to nullify lawful changes made by the executive branch acting in its quasi-legislative capacity. In particular, the majority emphasizes the purpose behind the *Earthburners* exception: "to prevent any unfairness to the applicant" by avoiding post hoc rationalizations. 513 N.W.2d at 463. As an appellate court, it is well within our authority to control the scope of a remand and to define what evidence is relevant to the proceedings, thereby controlling the quasi-judicial function of the Board. *See, e.g., Honn,* 313 N.W.2d at 416 (outlining proper procedure for review of zoning matters). Here, we could properly limit any evidence not relevant to the issue

raised in the first proceedings—higher costs due to road projects. But there is nothing new in the factual record except the ordinance amendment and a continuing concern for pole placement that is in the best economic interests of the County; the setback amendment does implicate these issues. In contrast, the judicial branch of the government does not have any constitutional authority to limit the exercise of the lawmaking functions of the legislature or executive agencies acting pursuant to delegated powers. Our role is to interpret the law. The majority suggests that we have turned a "blind eye" to conduct affecting a judicial order, but in the absence of a right to protect, the doctrine of separation of powers compels the judiciary to remand the case.

Deciding whether to apply new legislation to pending litigation is not new territory for this court. The doctrine of the "law of the case" is a rule of practice followed in Minnesota. *See Loo v. Loo,* 520 N.W.2d 740, 744 n. 1 (Minn.1994). "It is a discretionary doctrine developed by the appellate courts to effectuate the finality of appellate decisions. It ordinarily applies where an appellate court has ruled on a legal issue and has remanded the case to the lower court for further proceedings." *Id.* "Issues determined in a first appeal will not be relitigated in the trial court nor re-examined in a second appeal." *Mattson v. Underwriters at Lloyds of London,* 414 N.W.2d 717, 720 (Minn.1987).

There are exceptions to the law of the case doctrine however. The law of the case yields to a change in the relevant law pending appeal because there is no vested right in the existing law or in a pending action until final judgment has been entered. *See Pirkov–Middaugh v. Gillette Children's Hosp.,* 495 N.W.2d 608, 611 (Minn.1993); *Holen,* 250 Minn. at 137, 84 N.W.2d at 287. This case is slightly different from *Pirkov–Middaugh* and *Holen* because here there has been an appellate court decision and a remand for "addition-

al proceedings and appropriate findings." However, we have applied new legislation even after an appellate determination and remand.

In *Donaldson v. Chase Sec. Corp.*, we held that amendatory legislation must apply to a pending case even though the legislation was passed subsequent to a determination by this court that the cause of action was barred and a remand on another claim. 216 Minn. at 277–78, 13 N.W.2d at 5. In that case, the district court initially found in favor of the plaintiffs on their statutory securities law claim against the defendant's statute of limitations defense, but made no findings on a deceit based on misrepresentation claim. *See id.* at 271, 13 N.W.2d at 2. On appeal, we held that the statute of limitations had run against the plaintiff, and we remanded for findings on the deceit issue. *See id.* The district court found in favor of the plaintiffs on that issue. *See id.* The legislature then enacted a new securities statute of limitations proviso. Act of April 28, 1941, ch. 547 sec. 18, § 3996–24, 1941 Minn. Laws 1119 (codified as amended at Minn.Stat. § 80.26 (1941).) On appeal, we were asked to decide if the legislature intended with this new legislation to lift the bar of the statute where the statute of limitations had already run; if the legislature had the power to do so; and finally if the legislature intended the legislation to be applicable to pending litigation. *See Donaldson*, 216 Minn. at 272, 13 N.W.2d at 3. We noted that because the legislature acted promptly after our decision, "[t]he inference is plain that it was dissatisfied with the law as laid down" in our opinion and intended to lift the bar. *Id.* After deciding that the act was constitutional, we held that it must apply to the litigation:

[B]oth reason and the weight of authority seem to point to the view that, where a statute *which is clearly intended to be retroactive and apply to pending litigation* is enacted after judgment and pending appeal, the Appellate Court

may dispose of the case in accordance with the law as changed by the statute. *Id.* at 277, 13 N.W.2d at 5 (emphasis added).

More recently, we have framed the issue as one of the "finality of judgments" and held that determining the finality of judgment must be done by looking at what the appellate court has done:

If complete finality cannot be accomplished, if something remains to be done by the court below, the appellate court will ordinarily so indicate, usually by a remand with directions or a mandate which the trial court must follow. Consequently, the scope of the finality of an appellate decision depends on what the court intends to be final, and this is determined by what the court's decision says.

*Mattson*, 414 N.W.2d at 720; *see, e.g., Loo*, 520 N.W.2d at 746. Here, there was not a final judgment. The case was not remanded to Nobles County Board of Commissioners by the court of appeals for the summary issuance of a CUP. Instead, the question of whether Interstate was entitled to a CUP was still open; only the scope of the relevant evidence in the further proceedings was circumscribed. Thus, the law of the case, however circumscribed by the *Earthburners* remand, is no barrier to applying the relevant new legislation.

Other courts that have addressed the issue have also found that the district court can deviate from the mandate of an appellate court on remand where there has been an intervening change in controlling law. The leading case is *Banco Nacional de Cuba v. Farr*, 383 F.2d 166 (2d Cir. 1967). In a previous appeal of the same case, the United States Supreme Court had reversed the Second Circuit Court of Appeals and held that the trial court could not examine the validity of an expropriation by the Cuban government because of the "act of state" doctrine. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964).

The case was remanded to the district court to decide other litigable issues of fact in proceedings consistent with the Supreme Court's opinion and mandate. However, before the district court could enter a final judgment on the remanded issues, Congress enacted the Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e). The amendment provided that United States courts could not decline to determine expropriation cases because of the act of state doctrine. The district court had to determine whether to follow the Supreme Court mandate or apply the new amendment. It applied the new amendment and the Second Circuit agreed that the statute governed over the previous mandate:

We have learned of no case involving the effect on the rights of litigants of a federal statute, inconsistent with a Supreme Court mandate, which became law after the Supreme Court had remanded a case to the trial court but before the trial court had acted upon the merits after the remand. * * * We must therefore determine whether the mandate rule should cover this novel situation; it is our view that it should not be extended to do so.

The Supreme Court mandate rule is nothing more than one specific application of a general doctrine appellate courts apply to their orders to lower courts, a doctrine commonly referred to as the law of the case. Other courts in applying the law of the case rule have held that a lower court is not bound to follow the mandate of an appellate court if the mandate is, in the interim, affected by an authority superior to the court issuing the mandate, such as by a higher appellate court, either state or federal, or by an en banc decision of the same court. This principle has also been applied when the mandate of the court is affected by intervening statutory enactment. The same principle should apply here; any limiting language in the Supreme Court mandate should not preclude judicial application of the Amend-

ment in this case for the rule of law expressed by the mandate has been affected by a subsequently enacted federal statute.

*Banco*, 383 F.2d. at 178 (citations omitted). Further, the court set out the separation of powers problem in failing to apply the applicable legislation:

Moreover, * * * there may well be a constitutional objection to an application of the mandate here. The law of the case is not based on any constitutional authority but is only a doctrine of judicial administration based on the practice of the courts. A federal statute, on the other hand, is an assertion of its constitutional power by Congress and is entitled to respect as the supreme law of the land. It is questionable whether the courts may frustrate such a statute by interposing a judge-made rule of practice.

*Id.* (citations omitted).

The holding in *Banco* is in accord with our holding in *Donaldson* and with other jurisdictions that have decided the issue of the applicability of a change in law after remand. *See, e.g., Jordan v. Jordan*, 132 Ariz. 38, 643 P.2d 1008, 1013–14 (1982) (" '[L]aw of the case' doctrine is inapplicable where the policy of the law has been changed, by legislative enactment * * *, while the case is still pending resolution."); *Reich v. Miller*, 260 Iowa 929, 151 N.W.2d 605, 610 (1967) (holding that relevant change in procedural law is controlling in a pending case); *Petty v. Clark*, 113 Utah 205, 192 P.2d 589, 594 (1948) (holding that relevant change in controlling law is applicable to pending litigation where it does not contravene a constitutional provision or deprive anyone of due process of law).

Even if, as the majority concludes, the zoning authority intended to change the outcome in the case, it is of no consequence in this litigation. *See Holen*, 250 Minn. at 137, 84 N.W.2d at 287. In fact, in *Donaldson*, we searched for precisely this type of clear evidence in order to deter-

mine whether the legislature did in fact intend for the amendment to apply to pending litigation. 216 Minn. at 274, 13 N.W.2d at 4. We held that the court is "bound to give effect" to "obvious legislative purpose" when it is "expressed in clear language without qualification and the circumstances under which the law was enacted support the indicated purpose." *Id.* Similarly, in *Holen,* we cited the language of the new law, "as amended shall * * * operate not only prospectively, but retroactively," and found "[c]learly, the * * * legislature intended its amendatory legislation to be curative." 250 Minn. at 136, 84 N.W.2d at 286. Other jurisdictions have looked for similar evidence and reached the same holding. *See Banco,* 383 F.2d at 174–76 (holding that the amendment was intended to apply to pending cases and citing comments from legislative history: "The amendment is intended to reverse in part the recent decision of the Supreme Court in *Banco* * * *"; "[the amendment] applies to cases pending at the time of its enactment"; and "[w]e think it perfectly proper that the Congress of the United States should have the last word on this important policy question."); *Jordan,* 643 P.2d at 1014 n. 5 (looking at language of amendment and holding "[t]he legislative intent to give retrospective effect to the statute is obvious").

Instead of following *Donaldson* and applying the law as amended, the majority subjects the Board's adoption of the amendment to an analysis of whether they had a sufficient "articulated" reason for that adoption, rather than utilizing the "traditional standard of review" for certiorari—"whether the evidence provides a substantial basis for the decision." *Honn,* 313 N.W.2d at 414. In spite of the procedural posture of this case and the ban on reviewing quasi-legislative actions in writ of certiorari proceedings, the majority does not limit its review to the quasi-judicial meetings where the commissioners and board discussed the amendment as a basis for the denial, but looks instead at a June 24, 1998, meeting by the commission-

ers in which they engaged in quasi-legislative conduct, adopting the amendment. The majority effectively subjects the legislation and the Board's proceedings in adopting it to a rational basis review, placing the burden on the Board to have articulated a sufficient reason, rather than on Interstate where it properly belongs. *See generally State, by Rochester Ass'n of Neighborhoods,* 268 N.W.2d at 888 (stating that the burden for invalidating zoning legislation is on the opponent).

At the same time, the majority overlooks evidence indicating that although Interstate's application and the court of appeals' ruling brought this problem to the Board's attention, the Board may have intended this amendment to have general applicability to "all utilities." *See* Commissioners Meeting, July 7, 1998 (Zoning County Administrator: "[T]he amendments to the ordinance [do] not just apply to electrical, but also rural water, gas lines, etc. It is much easier to deal with all of them the same." Attorney for the County: "[T]his does not only include Interstate Power, as it is a larger problem tha[n] just Interstate. * * * [T]he new amendment applie[s] to all utilities. Reasons for denial should relate to health, safety, and welfare of all residents."). While this is the type of evidence that may be reviewed in a district court action, we should decline to engage in the analysis of the rationale behind quasi-legislative conduct in this certiorari proceeding.

Finally, as the majority correctly points out, other jurisdictions have applied a somewhat watered down version of zoning estoppel in which substantial expenditures need not be proven in order for the landowner to prevail. Instead, zoning authority bad faith is the only element that must be shown. Neither party urged this court to adopt such a test in this case. Furthermore, the courts in those cases were able to conclude that the zoning authority had acted in bad faith based on the evidence in the record and lower court findings. No

such finding has been made by the fact finder here and this case law is therefore inapplicable. *See, e.g., Marmah, Inc., v. Town of Greenwich,* 176 Conn. 116, 405 A.2d 63, 67 (1978) (determining that there was evidence to support the district court's finding that the Board acted with "predisposition and predetermination" rather than to promote the general welfare when it postponed action on the application in order to consider a proposed zoning regulation and the application simultaneously and adopt the regulation in order to deny the application); *United States Cellular Corp. v. Board of Adjustment,* 589 N.W.2d 712, 718 (Iowa 1999) (determining that the district court's finding that the Board acted in bad faith was supported by evidence in the record that the Board relied on an ordinance not yet in effect to deny the application; that the Board's written decision did not accurately reflect its action at the meeting; that the reasons given in the written decision were not supported by evidence in the record; and that the Board exaggerated the level of neighborhood opposition); *Whitehead Oil Co. v. City of Lincoln,* 245 Neb. 660, 515 N.W.2d 390, 400 (1994) (holding that the city had not acted to promote the general welfare based on evidence that though the change in zoning designation encompassed a larger area, it was intended to and achieved the result of only affecting Whitehead; the petition for the change of zoning was filed on the same day the commission was scheduled to issue its recommendation on the application; and finally the application was several times delayed so as to allow the change of zoning request to "catch up" with the use permit so that they could be considered together); *State ex rel. Humble Oil & Refining Co. v. Wahner,* 25 Wis.2d 1, 130 N.W.2d 304, 306, 311 (Wis.1964) (determining that the district court's finding that the town acted arbitrarily and capriciously was supported by evidence that the intersection where Humble applied to place a filling station had a filling station on each other corner; that the Board approved the application of one ex-

isting station to expand; and meanwhile the Board three times denied Humble's application without formal findings or a statement of reasons). Here, the majority reaches the same legal conclusion without the required factual basis.

Rather than infringing on quasi-legislative power, which because of the procedural posture of this case we must presume was validly exercised, I would only decide whether there is substantial evidence in the record to support the findings that implicated the amendment. In those two findings of fact, the Board asserts that the proposed pole placement is "inconsistent with the Zoning Ordinance, Policy Plan, and purposes of the AG District" and the "overall needs of the County." The initial application for a CUP was approved at least in part because under the County's definitions contained in its zoning ordinance, Interstate's proposed use is not prohibited or incompatible with the overall "needs" of the County. In fact, Interstate's transmission and distribution lines are classified as "essential services" under the County's zoning ordinances, which defines such services as those that *"are required* for protection of the public health, safety, or general welfare." NCO § 302(38) (emphasis added). Interstate's proposed use is a conditional use which the county ordinance defines as "[a] use [which] *generally may be appropriate or desirable in a specified zone,* but requires special approval" for location and design to avoid "special problems such as excessive height or bulk or abnormal traffic congestion." NCO § 302(26) (emphasis added); *see also* § 603.4. The record indicates that the proposed power line's design and location have not presented any of the inherent hazards or special problems of height, bulk or negative impact on traffic that the code was designed to avoid and that are embodied in the factors governing the issuance of conditional use permits found in the county ordinance. There is no evidence that the proposed use would endanger the health, safety or general welfare of

the community. "The control of uses authorized within a zone must have a substantial relationship to the public good and not result from a desire to resist the operation of economic laws." *Metro 500, Inc. v. City of Brooklyn Park*, 297 Minn. 294, 302, 211 N.W.2d 358, 363 (1973). Thus, there is no substantial evidence that relates to the needs and welfare of the County to support the conclusion that the CUP must be denied because of its inconsistency with the new setback amendment. On that basis, I would reverse the court of appeals and remand to the County with an order to issue the CUP and leave the legality and effect of the setback amendment for another day.

PAUL H. ANDERSON, Justice (concurring in part, dissenting in part).

I join the concurrence/dissent of Justice GILBERT.